**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **EXXON MOBIL CORPORATION,** | § § § | |
| *Plaintiff* | § § | |
| **v.** | § § | **CASE NO. 4:24-CV-00069-P** |
| **ARJUNA CAPITAL, LLC and FOLLOW THIS,** | § § § | |
| *Defendants* | § § | |

**APPENDIX IN SUPPORT OF ARJUNA CAPITAL, LLC'S MOTION TO DISMISS**

Arjuna Shareholder Proposal ............................................................................. A.001

Letter to Exxon Mobil Corporation dated December 15, 2023 ........................... A.002

Letter to Natasha Lamb dated December 22, 2023 ............................................. A.003

Letter to McKenzie Ursch dated December 22, 2023 .......................................... A.014

Email to Shareholder Relations re: Exxon – Shareholder
Proposal ............................................................................................................. A.025

Email to Julia Cedarholm re: Exxon – Shareholder Proposal –
invitation to engagement .................................................................................... A.027

Letter to Ferrell Keel dated January 29, 2024 .................................................... A.030

Letter to Ferrell Keel dated January 29, 2024 .................................................... A.031

*Bazzrea v. Mayorkas*, No. 3:22-cv-265,
2023 U.S. Dist. LEXIS 101876 (S.D. Tex. 2023) ............................................... A.032

*Hamann v. Smith*, No. 4:23-CV-098-P,
2023 U.S. Dist. LEXIS 136618, (N.D. Tex. Aug. 7, 2023) ................................. A.043

*Jackson v. Mayorkas*, No. 4:22-cv-0825-P,
2023 U.S. Dist. LEXIS 144078, (N.D. Tex. Aug. 17, 2023) ............................... A.045

Respectfully submitted,

ARJUNA CAPITAL, LLC, Defendant

By Its Attorneys,

February 12, 2024

*s/ Ross Mortillaro*
Ross Mortillaro
State Bar No. 24027531
Email: ross.mortillaro@stinson.com
Zachary Ford
State Bar No. 24116373
Email: zach.ford@stinson.com
Stinson LLP
2200 Ross Avenue
Dallas, TX 75201
Tel: (214) 560-2224

Matthew E. Miller
MA Bar. No. 655544
(*pro hac vice* pending)
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel: (617) 832-1000
Email: mmiller@foleyhaog.com

Veronica M. Renzi
DC Bar No. 371654
(*pro hac vice* pending)
Foley Hoag LLP
1717 K Street NW
Washington, DC 20006
Tel: (202) 223-1200
Email: vrenzi@foleyhoag.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2024, a true and correct copy of the above and foregoing document has been served upon all counsel in accordance with the Federal Rules of Civil Procedure.

/s/ Ross Mortillaro
Ross Mortillaro

**Emission Reduction Targets**

**Resolved**: Shareholders support the Company, by an advisory vote, to go beyond current plans, further accelerating the pace of emission reductions in the medium-term for its greenhouse gas (GHG) emissions across Scope 1, 2, and 3, and to summarize new plans, targets, and timetables.

**Whereas**: In the absence of effective climate change mitigation, up to 10 percent of global economic value could be lost by 2050.[1] The Intergovernmental Panel on Climate Change (IPCC) has advised that GHG emissions must be halved by 2030 and reach net zero by 2050 to limit global warming to 1.5 degrees Celsius. Every incremental increase in temperature above 1.5 degrees will increase physical, transition, and systemic risks for companies and investors alike.[2]

*Current Goals:* Exxon has acknowledged the importance of reduction goals for Scope 1 and 2 emissions by setting intensity targets across its value chain. The Company has also set GHG intensity targets for its upstream sector and upstream operations in the Permian.

Yet, Exxon's current 2030 targets are significantly below the IPCC's recommendation of 50 percent absolute emission reductions. The Company's current metrics are all on an intensity basis, which allow the Company to increase its absolute emissions. Furthermore, Exxon lacks any Scope 3 target, which account for 90 percent of its carbon footprint.[3]

*Capital Expenditures:* The International Energy Agency reports peak global demand for coal, oil, and gas could be reached before 2030.[4] Despite this trajectory, Exxon anticipates total annual capital expenditures and exploration expenses of 23 to 25 billion in 2024, increasing up to 27 billion per year from 2025 to 2027. While Exxon plans 20 billion in total low carbon spending through 2027, this amounts to only about 15 percent of its overall total planned capital expenditures. This spending will increase Exxon's oil and gas output by 10 percent.[5] Carbon Tracker projects that even under a moderate transition scenario, continued oil and gas investments could lead to commodity oversupply, resulting in lower pricing, negatively impacting existing and new project revenue.[6]

*Cost of Capital:* Exxon's cost of capital may substantially increase if it fails to control transition risks by significantly reducing absolute emissions. In October, federal bank regulatory agencies issued Principles for Climate-Related Financial Risk Management for Large Financial Institutions, warning such institutions to thoroughly address risks associated with climate change within their investments.[7]

*Peer Targets:* Oil and gas peers BP, TotalEnergies, Repsol, and Eni recognize climate transition risks and have set more ambitious, medium-term emission reduction targets. These companies aim to reduce absolute Scope 1, 2, and 3 targets by at least 30 percent by 2030. Other peers Chevron, Equinor, Shell, and Suncor have set goals to decrease Scope 3 emissions.

---

[1] https://www.swissre.com/dam/jcr:5d558fa2-9c15-419d-8dce-73c080fca3ba/SRI_%20Expertise_Publication_EN_LITE_The%20economics_of_climate_change.pdf
[2] https://www.ipcc.ch/2022/04/04/ipcc-ar6-wgiii-pressrelease/
[3] https://corporate.exxonmobil.com/news/reporting-and-publications/advancing-climate-solutions-progress-report
[4] https://www.nytimes.com/2023/10/24/climate/international-energy-agency-peak-demand.html
[5] https://investor.exxonmobil.com/news-events/press-releases/detail/1154/exxonmobil-corporate-plan-more-than-doubles-earnings
[6] https://carbontracker.org/reports/navigating-peak-demand/
[7] https://www.federalreserve.gov/newsevents/pressreleases/bcreg20231024b.htm



Follow This

15 December 2023

**Via electronic mail**

Exxon Mobil Corporation
ATTN: Craig S. Morford, Secretary

Re:  Shareholder proposal for 2024 Annual Shareholder Meeting

Dear Mr. Morford,

I am submitting the attached proposal (the "Proposal") on behalf of Follow This, pursuant to the Securities and Exchange Commission's Rule 14a-8 to be included in the proxy statement of ExxonMobil Corporation (the "Company") for its 2024 annual meeting of shareholders. I am co-filing the Proposal with lead filer Arjuna Capital. In its submission letter, Arjuna Capital will provide dates and times of ability to meet. I designate the lead filer to meet initially with the Company but may join the meeting subject to my availability.

I have continuously beneficially owned, for at least 3 years as of the date hereof, at least $2,000 worth of the Company's common stock. Verification of this ownership will be sent under separate cover. I intend to continue to hold such shares through the date of the Company's 2024 annual meeting of shareholders.

If you have any questions or need additional information, I can be contacted on +31 06 40 16 26 72 or by email at mckenzieursch@follow-this.org

Sincerely,

*McKenzie Ursch*

McKenzie Ursch
Follow This

App.002

**Exxon Mobil Corporation**

Jennifer Driscoll
Vice President, Investor Relations

## ExⅩonMobil

<u>**VIA EMAIL**</u>

December 22, 2023

Natasha Lamb
Managing Partner
Arjuna Capital

Dear Ms. Lamb:

Thank you for your interest in ExxonMobil. This letter acknowledges that we've received your shareholder proposal concerning Emission Reduction Targets (the "Proposal"), which you have submitted on behalf of Kimberly Indresano (the "Proponent") in connection with ExxonMobil's 2024 annual meeting of shareholders. The Proposal contains certain deficiencies, which the Securities and Exchange Commission ("SEC") regulations require us to bring to your attention. Your brokers' proofs must indicate that you have continuously held at least the requisite number of shares for the applicable time period preceding and including the December 14, 2023, date of your submission. Further information on each of these requirements is detailed below.

*Does Not Meet Ownership Eligibility*

In order to be eligible to submit a shareholder proposal, Rule 14a-8, as amended (copy enclosed), requires that Kimberly Indresano must have continuously held, as of the date the proposal was submitted at least (i) $2,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least three years, (ii) $15,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least two years, or (iii) $25,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least one year, for the applicable period through and including the date the shareholder proposal was submitted.

You do not appear in our records as a registered shareholder. Moreover, to date we have not received proof that Kimberly Indresano has satisfied these ownership requirements. To remedy this defect, you must submit sufficient proof verifying your continuous ownership of the requisite number of ExxonMobil shares for the applicable time period preceding and including December 14, 2023.

As explained in Rule 14a-8(b) and SEC staff guidance, sufficient proof must be in the form of:

- a written statement from the "record" holder of your shares (usually a broker or a bank) verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 14, 2023; or

Natasha Lamb
Page 2

- if you have filed with the SEC a Schedule 13D, Schedule 13G, Form 3, Form 4 or Form 5, or amendments to those documents or updated forms, reflecting your ownership of the requisite number of ExxonMobil shares as of or before the date on which the required holding period begins, a copy of the schedule and/or form, and any subsequent amendments reporting a change in the ownership level and a written statement that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 14, 2023.

If you intend to demonstrate ownership by submitting a written statement from the "record" holder of your shares as set forth in the first bullet point above, please note that most large U.S. brokers and banks deposit their customers' securities with, and hold those securities through, the Depository Trust Company ("DTC"), a registered clearing agency that acts as a securities depository (DTC is also known through the account name of Cede & Co.). Such brokers and banks are often referred to as "participants" in DTC. In Staff Legal Bulletin No. 14F (October 18, 2011) (copy enclosed), the SEC staff has taken the view that only DTC participants should be viewed as "record" holders of securities that are deposited with DTC. As the SEC adopted amendments to Rule 14a-8 that became effective in 2021, please note that Staff Legal Bulletin No. 14F does not reflect those amendments, and to the extent any provisions are inconsistent, Rule 14a-8 governs in all respects.

You can confirm whether your broker or bank is a DTC participant by asking your broker or bank or by checking the listing of current DTC participants, which is available online at: *https://www.dtcc.com/client-center/dtc-directories*. In these situations, shareholders need to obtain proof of ownership from the DTC participant through which the securities are held, as follows:

- If your broker or bank is a DTC participant, then you need to submit a written statement from your broker or bank verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 14, 2023.

- If your broker or bank is not a DTC participant, then you need to submit proof of ownership from the DTC participant through which the securities are held verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 14, 2023. You should be able to find out who this DTC participant is by asking your broker or bank. If your broker is an introducing broker, you may also be able to learn the identity and telephone number of the DTC participant through your account statements because the clearing broker identified on your account statements will generally be a DTC participant. If the DTC participant that holds your shares knows your broker's or bank's holdings, but does not know your holdings, you need to satisfy the proof of ownership requirement by obtaining and submitting two proof of ownership statements verifying that for the applicable period preceding and including December 14, 2023, the required amount of securities were continuously held – one from your broker or bank, confirming your ownership, and the other from the DTC participant, confirming the broker or bank's ownership.

*One Proposal Per Person/Group*

Under Rule 14a-8(c), a person cannot submit more than one proposal to a company, either directly or indirectly. The SEC has long recognized that multiple people controlled by a single

Natasha Lamb
Page 3

entity or acting as a coordinated group or taking concerted actions may be treated as a single person under the SEC's rules. Congress created the concepts of "control" and "group" to protect against the evasion of disclosure requirements by people who collectively seek to change or influence control over a public company. Accordingly, the SEC takes an expansive view of who or what may qualify as a person.[1]

Relationships of control or the creation of a group among different shareholder proponents suggest that the proponents should be treated as a single "person." Again, each person may submit only one proposal. If multiple controlled entities or members of a group submit multiple proposals, it creates a deficiency in the submission of each of the proposals since the single "person" has submitted multiple proposals.

We believe your concerted work on the "Racial & Gender Pay Scorecard"[2] with As You Sow, Proxy Impact and others, your sponsorship of the "Proxy Preview"[3] and the creation of CURE (Coalition for a Responsible Exxon), as further described below, should cause you and each of the aforementioned entities to be recognized as a single "person." Accordingly, there is a deficiency in your submission since, in addition to the Proposal, the following proposals have also been submitted by As You Sow and Proxy Impact for the 2024 annual meeting (see attached):

1. Report on Plastic Production Under SCS Scenario (As You Sow)
2. Report on Climate Impacts of Divestments (As You Sow)
3. Report on Racial and Gender Pay Gap (Proxy Impact)

This deficiency may be remedied by all but one of the above proposals being withdrawn. Otherwise, each of the proposals may be excluded from the proxy statement this year given that they violate Rule 14a-8.

The increasing professionalization of anti-oil and gas activists submitting shareholder proposals has created a question of whether some proposals should be considered separate proposals from separate persons or represent multiple proposals from the same person. Many other types of coordination, such as funding relationships, joint service or employment relationships, joint publication of filed and unfiled solicitation materials, and other efforts that go beyond the creation, submission, or presentation of a shareholder proposal, can give rise to a control

---

[1] As an example of the SEC's focus on the concept of "control," in the adopting release for the final rule relating to the "Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8" (https://www.sec.gov/files/rules/final/2020/34-89964.pdf), the SEC did not define "person" as a natural person or single entity. Instead, it stated that any entities and all persons under their *control* (emphasis added) will be treated as a "person" under Rule 14a-8(c).

As an example of the SEC's interpretation of the concept of a "group," in the adopting release for the final rule and guidance relating to the "Modernization of Beneficial Ownership Reporting" (https://www.sec.gov/files/rules/final/2023/33-11253.pdf), the SEC clarified that the joint or coordinated publication of soliciting materials with an activist investor could indicate "group" formation under Rule 13D.

[2] https://static1.squarespace.com/static/5bc65db67d0c9102cca54b74/t/640f22770d7c0634287c57c3/1678713464204/Racial+and+Gender+Pay+Scorecard+2023.pdf

[3] https://www.proxypreview.org/2023/report

Natasha Lamb
Page 4

relationship or a "group" that should be treated as a single person to avoid the subversion of the shareholder proposal process. For example, if shareholders have an arrangement, understanding, or agreement—written or otherwise—to vote against certain directors or management proposals if their shareholder proposal(s) are not included in the proxy statement, the SEC would deem that "group" behavior. Arjuna's work with As You Sow and Proxy Impact on CURE during our proxy contest in 2021, where you created your own organized coalition to oppose ExxonMobil's directors, is further evidence of the long-standing nature of your concerted coordination through multiple proxy seasons.[4]

The SEC currently asks proponents to self-identify. As a result, relationships among proponents are often not immediately clear to the company and hinder our ability to notify you of any deficiency in the Proposal. We note that public records show significant connections between Arjuna Capital and these groups today that may create control, affiliate or group relationships, though perhaps not the full extent of these relationships. We encourage you to disclose any current or planned coordinated efforts or group relationships or activities so that we can work with you to find appropriate remedies that minimize costs to shareholders and to the proponents, and that comply with the SEC's rules.

ExxonMobil believes information on these relationships and behavior is important in both the proposal submission process and the disclosure in the proxy statement since professional activists may not share the same incentives as other shareholders. For example, if activists are being paid for the submission of proposals, they are likely to be less sensitive than other shareholders to both the monetary costs and significant management burden created by responding to a large number of shareholder proposals. This belief has been confirmed by our shareholders, who have stated that information on an activist's activities is material to them and does influence their voting behavior similar to the information disclosed in a 13D filing on a group's investment strategy and plans for a company.

Accordingly, ExxonMobil believes that if you choose not to disclose any of these relationships or behaviors, you may be making a material omission in violation of the SEC's Rule 14a-9 antifraud rules. As such, we strongly encourage you to disclose now any relationships, actions or intended actions that you will undertake that could suggest you are coordinating with others in a concerted effort to influence the voting of securities either as a "group" or in violation of SEC rules. To the extent we later become aware of undisclosed relationships or actions in violation of these rules, we plan to share the information with shareholders and the SEC, as appropriate. We continue to believe this is an important issue as ExxonMobil regularly receives among the highest number of proposals of any U.S. company.

*Cure Period/Springing Deficiencies*

The SEC's rules require that these defects we have identified be remedied, and any response to this letter must be postmarked or transmitted electronically to us no later than 14 calendar days from the date this letter is received. Please mail any response to me at ExxonMobil at the address shown above. Alternatively, you may send your response to me by email to ███████████████████████ The failure to correct the deficiencies within this time

---

[4] https://www.globenewswire.com/news-release/2021/02/02/2168665/0/en/Coalition-United-for-a-Responsible-Exxon-CURE-Representing-Stakeholders-with-over-2-2-Trillion-in-Assets-Calls-for-New-Leadership-and-Strategy-at-Exxon.html

Natasha Lamb
Page 5

period will provide the company with a basis to exclude the Proposal from the company's proxy statement for the 2024 annual meeting.

It is possible that, based on information not disclosed in your submission, or as a result of your future actions or information of which ExxonMobil otherwise becomes aware, additional deficiencies in the Proposal may arise. These "springing deficiencies" include actions contrary to Rule 14a-8, which limits each proponent to no more than one proposal per meeting, such as:

(1) submission of another proposal by you, including submissions under alternate names or aliases;

(2) joint publication with the proponent of another proposal of filed or unfiled solicitation materials, or other concerted actions together on one or more proxy matters, whether such actions are taken under common control or by the continuation or creation of a "group" (as discussed above); or

(3) the discovery by the company of "affiliate" or "control" relationships between you and another proponent, meaning that the multiple proponents should be considered a single "person."

Upon the discovery of a springing deficiency, the company will send you an additional deficiency notice similar to this letter. To the extent permitted by the timing of the springing deficiency, we will seek to provide an additional 14 calendar days from the date that the springing deficiency notice is received for any response. However, we are notifying you now of the potential for these springing deficiencies. To the extent that any may exist that have not been disclosed, you may address them with the company in the 14 calendar days from the date this letter is received.

The company reserves the right, as any current relationships among and activities of proponents come to light or as future group activities are started prior to the annual meeting, to provide you notice of the deficiency, consistent with SEC rules, and potentially either exclude the proposal from the proxy statement or, if already filed, cancel a vote on an ineligible matter. The later discovery of these deficiencies by the company, even if within 14 days of the mailing of the proxy or 14 days of the annual meeting, will not prevent the company from determining that you have been notified of the deficiency in a timely manner and excluding the Proposal or, if already filed, canceling a vote on an ineligible matter.

You should note that, if the Proposal is not withdrawn or excluded, you or your representative, who is qualified under New Jersey law to present the Proposal on your behalf, must attend the annual meeting to present the Proposal. Under New Jersey law, only shareholders or their duly constituted proxies are entitled as a matter of right to attend the meeting.

If you intend for a representative to present the Proposal, you must provide documentation that specifically identifies your intended representative by name and specifically authorizes the representative to act as your proxy at the annual meeting.

To be a valid proxy entitled to attend the annual meeting, the representative must have the authority to vote your shares at the meeting. A copy of this authorization meeting state law requirements should be sent to my attention in advance of the meeting. The authorized representative should also bring an original signed copy of the proxy documentation to the meeting so that our counsel may verify the representative's authority to act on your behalf prior to the start of the meeting.

Natasha Lamb
Page 6

In the event there are co-filers for this Proposal and in light of the guidance in SEC Staff Legal Bulletin No. 14F dealing with co-filers of shareholder proposals, it is important to ensure that the lead filer has clear authority to act on behalf of all co-filers, including with respect to any potential negotiated withdrawal of the proposal. Unless the lead filer can represent that it holds such authority on behalf of all co-filers, and considering SEC staff guidance, it will be difficult for us to engage in productive dialogue concerning this Proposal.

Note that under Staff Legal Bulletin No. 14F, the SEC will distribute no-action responses under Rule 14a-8 by email to companies and proponents. We encourage you, and all proponents and any co-filers, to include an email contact address on any additional correspondence to ensure timely communication in the event the Proposal is subject to a no-action request.

I hope that's helpful to you.

Last, we are interested in discussing this Proposal and will contact you in the near future about setting up a virtual meeting.

Sincerely,



JKD/sme

Enclosures

c: Kimberly Indresano
   Julia Cedarholm

Natasha Lamb
Page 7

## Attached Proposals

1. Report on Plastic Production Under SCS Scenario (As You Sow)
2. Report on Climate Impacts of Divestments (As You Sow)
3. Report on Racial and Gender Pay Gap (Proxy Impact)

**WHEREAS**:  Plastic, with a lifecycle social cost at least ten times its market price, threatens the world's oceans, wildlife, and public health.[1] Concern about the growing scale and impact of global plastic pollution has elevated the issue to crisis levels.[2] Of particular concern are single-use plastics (SUPs), which make up the bulk of the 24-34 million metric tons of plastic ending up in waterways annually.[3] Without drastic action, this amount could triple by 2040.[4]

A shift from virgin plastic production is critical to reducing plastic pollution.[5] The Environmental Protection Agency's draft strategy to prevent plastic pollution calls for voluntary reduction in production.[6] A robust pathway addressing plastic pollution is presented in the widely respected *Breaking the Plastic Wave* report, which found that plastic leakage into the ocean can be reduced 80 percent under its System Change Scenario (SCS), but requires a significant absolute reduction of virgin SUPs.[7]

In response to the plastic pollution crisis and the necessity of reducing plastic production, countries and major packaging brands are beginning to drive reductions in plastic use.[8] This will affect the plastic production supply chain. BP has recognized the potential disruption global SUP reductions could have on the oil industry, finding a global SUP ban by 2040 would reduce oil demand growth by 60 percent.[9]

The Company faces growing risk from continued investment in virgin plastic production infrastructure. Several implications of the SCS, including a one-third absolute demand reduction of mostly of virgin SUPs and immediate reductions in new investment in virgin production, are at odds with ExxonMobil's planned investments. The Company has been identified as the largest global producer of SUP-bound polymers (11.5 million metric tons in 2021).[10] It has committed to increased use of recycled polymers but uses pyrolysis oil to generate plastic feedstock, a controversial process cited as inefficient and greenhouse gas-intensive with toxic byproducts and emissions, which may increase financial and reputational risk.[11]

Exxon's efforts to reduce plastic waste fail to address the potential for regulatory restrictions or a

[1] https://wwfint.awsassets.panda.org/downloads/wwf_pctsee_report_english.pdf, p.15
[2] https://www.unep.org/resources/pollution-solution-global-assessment-marine-litter-and-plastic-pollution
[3] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32019L0904&from=EN#page=8; https://www.minderoo.org/plastic-waste-makers-index/
[4] https://www.nationalgeographic.com/science/article/plastic-trash-in-seas-will-nearly-triple-by-2040-if-nothing-done
[5] https://www.theguardian.com/environment/2021/jul/01/call-for-global-treaty-to-end-production-of-virgin-plastic-by-2040
[6] https://www.epa.gov/system/files/documents/2023-04/Draft_National_Strategy_to_Prevent_Plastic_Pollution.pdf, p.17
[7] https://www.pewtrusts.org/-/media/assets/2020/07/breakingtheplasticwave_report.pdf
[8] https://www.pbs.org/newshour/science/bold-single-use-plastic-ban-kicks-europes-plastic-purge-into-high-gear; https://www.businessforplasticstreaty.org/
[9] https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/energy-outlook/bp-energy-outlook-2019.pdf#page=18
[10] https://cdn.minderoo.content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf
[11] https://eandt.theiet.org/content/articles/2022/11/is-chemical-recycling-greenwashing; https://theintercept.com/2023/09/28/braven-plastic-recycling-toxic-waste/

significant disruption in demand for virgin plastic, which could result in stranded assets.[12]

**RESOLVED:** Shareholders request that ExxonMobil issue a report, at reasonable cost and omitting proprietary information, addressing whether and how a significant reduction in virgin plastic demand, as set forth in *Breaking the Plastic Wave*'s System Change Scenario, would affect the Company's financial position and the assumptions underlying its financial statements.

**SUPPORTING STATEMENT:** Proponents recommend that, at Board discretion, the report include:
- Quantification of its polymer production for SUP markets;
- A summary of existing and planned investments that may be materially impacted by the SCS; and
- Disclosure of key metrics for chemical recycling processes, including inputs, outputs/yield, energy use, carbon and waste emissions, and any related measures taken to ensure safe operations.

---

[12] https://www.forbes.com/sites/scottcarpenter/2020/09/05/why-the-oil-industrys-400-billion-bet-on-plastics-could-backfire/?sh=6e099bd843fe

**WHEREAS:** Transferring emissions from one company to another may reduce balance sheet emissions, but it does not mitigate company or stakeholder exposure to climate risk or contribute to the goal of limiting global temperature rise to 1.5 degrees Celsius (1.5°C). In the aggregate, upstream oil and gas assets are moving from operators with stronger climate targets and disclosures to operators with weaker climate commitments.[1] The Glasgow Financial Alliance for Net Zero warns that divestment from high-emitting assets can "have the unintended consequence of prolonging the life of high-emitting assets and even worsen emissions profiles."[2] It is therefore essential that oil and gas operators adhere to industry-wide best climate practices for asset transfers and acquisition, such as reporting transferred emissions and working with buyers to ensure transferred assets retain climate standards.

ExxonMobil reports an operational emissions reduction of 5.4% on an equity basis and 12.5% on an operated basis since 2016.[3] However, between 2017 and 2021, Exxon sold more assets than any other American oil and gas company except Chevron, ranking fourth globally among sellers.[4] Exxon does not disclose the climate impacts of its divestments. This reporting gap leaves investors with an incomplete understanding of Exxon's actions to mitigate its contribution to climate change.

To address this issue, Exxon should follow best practices for divestitures, including conducting climate-related due diligence on acquirers, including an evaluation of purchasers' emissions reporting and reduction targets. Doing so would allow Exxon to ensure that purchasers maintain or enhance existing climate standards for divested assets, reducing the likelihood that transferred assets would result in higher emissions.[5]

By increasing transparency and providing greenhouse gas emissions-related disclosures for asset transfers, Exxon can position itself as a leader on climate change, increase the legitimacy of the its climate targets, and provide essential information to its investors about its efforts to mitigate climate risk.

**RESOLVED:** Shareholders request that ExxonMobil annually report on divestitures of assets with material climate impact, including whether each asset purchaser discloses its GHG emissions and has 1.5°C-aligned or other greenhouse gas reduction targets.

---

[1] https://business.edf.org/files/Transferred-Emissions-How-Oil-Gas-MA-Hamper-Energy-Transition.pdf, p.17
[2] https://assets.bbhub.io/company/sites/63/2022/10/GFANZ-2022-Progress-Report.pdf, p. 36
[3] https://corporate.exxonmobil.com/-/media/global/files/advancing-climate-solutions-progress-report/2023/2023-acs-ghg-data-supplement.pdf, p. 4
[4] https://business.edf.org/files/Transferred-Emissions-How-Oil-Gas-MA-Hamper-Energy-Transition.pdf, p. 22
[5] https://business.edf.org/wp-content/blogs.dir/90/files/Climate-Principles-Asset-Transfer.pdf, p.3

### Exxon Mobil: Racial and Gender Pay Gap Reporting, 2024

Whereas: Pay inequities persist across race and gender and pose substantial risks to companies and society. Black workers' median annual earnings represent 77 percent of white wages. The median income for women working full time is 84 percent that of men. Intersecting race, Black women earn 76 percent and Latina women 63 percent.[1] At the current rate, women will not reach pay equity until 2059, Black women in 2130, and Latina women in 2224.[2]

Citigroup estimates closing minority and gender wage gaps 20 years ago could have generated 12 trillion dollars in additional national income. PwC estimates closing the gender pay gap could boost Organization for Economic Cooperation and Development (OECD) countries' economies by 2 trillion dollars annually.[3]

Actively managing pay equity is associated with improved representation. Diversity in leadership is linked to superior stock performance and return on equity.[4] Minorities represent 64 percent of Exxon's global workforce and 28 percent of executives. Women represent 34 percent of the global workforce and 27 percent of executives.[5]

Best practice pay equity reporting consists of two parts:

1. *unadjusted* median pay gaps, assessing equal opportunity to high paying roles,
2. statistically *adjusted* gaps, assessing whether minorities and non-minorities, men and women, are paid the same for similar roles.

Exxon Mobil does not report quantitative unadjusted or adjusted pay gaps. About 50 percent of the 100 largest U.S. employers currently report adjusted gaps, and an increasing number of companies disclose unadjusted gaps to address the structural bias women and minorities face regarding job opportunity and pay.[6]

Racial and gender *unadjusted* median pay gaps are accepted as *the* valid way of measuring pay inequity by the United States Census Bureau, Department of Labor, OECD, and International Labor Organization. The United Kingdom and Ireland mandate disclosure of median gender pay gaps.[7] Exxon Mobil already provides this information for United Kingdom employees, and investors should be able to expect the same level of disclosure for all employers.

**Resolved:** Shareholders request Exxon Mobil report on both quantitative *median and adjusted* pay gaps across race and gender, including associated policy, reputational, competitive, and operational risks, and risks related to recruiting and retaining diverse talent. The report should be prepared at reasonable cost, omitting proprietary information, litigation strategy and legal compliance information.

Racial/gender pay gaps are defined as the difference between non-minority and minority/male and female *median* earnings expressed as a percentage of non-minority/male earnings (Wikipedia/OECD, respectively).

**Supporting Statement:** An annual report adequate for investors to assess performance could, with board discretion, integrate base, bonus and equity compensation to calculate:
- percentage median and adjusted gender pay gap, globally and/or by country, where appropriate
- percentage median and adjusted racial/minority/ethnicity pay gap, US and/or by country, where appropriate

1 https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-05.html - par_textimage_24
2 https://www.proxyimpact.com/_files/ugd/b07274_d88f00b8786f4bd8bcf27a0c4bb66e35.pdf
3 Ibid.
4 Ibid.
5 https://corporate.exxonmobil.com/-/media/global/files/sustainability/social/investing-in-people-old.pdf
6 https://diversiq.com/which-sp-500-companies-disclose-gender-pay-equity-data/
7 https://www.proxyimpact.com/_files/ugd/b07274_d88f00b8786f4bd8bcf27a0c4bb66e35.pdf

**Exxon Mobil Corporation**
███████████████████████

**Sherry M. Englande**
ESG Manager, Investor Relations

**ExxonMobil**

**VIA EMAIL**

December 22, 2023

McKenzie Ursch
Follow This
████████████████
████████████████████

Dear Mr. Ursch:

Thank you for your interest in ExxonMobil. This letter acknowledges that we've received your letter indicating that you wish to co-file on behalf of Follow This (the "Co-filer"), the proposal previously submitted by Arjuna Capital (the "Proponent") concerning Emission Reduction Targets (the "Proposal") in connection with ExxonMobil's 2024 annual meeting of shareholders. However, proof of share ownership was not included with your December 15, 2023, submission.

*Does Not Meet Ownership Eligibility*

In order to be eligible to submit a shareholder proposal, Rule 14a-8, as amended (copy enclosed), requires that each co-filer must have continuously held, as of the date the proposal was submitted at least (i) $2,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least three years, (ii) $15,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least two years, or (iii) $25,000 in market value of the company's securities entitled to vote on the proposal at the meeting for at least one year, for the applicable period through and including the date the shareholder proposal was submitted.

For this Proposal, the date of submission is December 15, 2023, which is the date the Proposal was received electronically by email.

Note that the SEC rules do not permit a shareholder to aggregate the co-filer's shareholdings with those of another shareholder or group of shareholders to meet the ownership eligibility requirement.

You do not appear in our records as a registered shareholder. Moreover, to date we have not received proof that Follow This has satisfied these ownership requirements. To remedy this defect, you must submit sufficient proof verifying your continuous ownership of the requisite number of ExxonMobil shares for the applicable time period preceding and including December 15, 2023.

As explained in Rule 14a-8(b) and SEC staff guidance, sufficient proof must be in the form of:

McKenzie Ursch
Page 2

- a written statement from the "record" holder of your shares (usually a broker or a bank) verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 15, 2023; or

- if you have filed with the SEC a Schedule 13D, Schedule 13G, Form 3, Form 4 or Form 5, or amendments to those documents or updated forms, reflecting your ownership of the requisite number of ExxonMobil shares as of or before the date on which the required holding period begins, a copy of the schedule and/or form, and any subsequent amendments reporting a change in the ownership level and a written statement that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 15, 2023.

If you intend to demonstrate ownership by submitting a written statement from the "record" holder of your shares as set forth in the first bullet point above, please note that most large U.S. brokers and banks deposit their customers' securities with, and hold those securities through, the Depository Trust Company ("DTC"), a registered clearing agency that acts as a securities depository (DTC is also known through the account name of Cede & Co.). Such brokers and banks are often referred to as "participants" in DTC. In Staff Legal Bulletin No. 14F (October 18, 2011) (copy enclosed), the SEC staff has taken the view that only DTC participants should be viewed as "record" holders of securities that are deposited with DTC. As the SEC adopted amendments to Rule 14a-8 that became effective in 2021, please note that Staff Legal Bulletin No. 14F does not reflect those amendments, and to the extent any provisions are inconsistent, Rule 14a-8 governs in all respects.

You can confirm whether your broker or bank is a DTC participant by asking your broker or bank or by checking the listing of current DTC participants, which is available online at: *https://www.dtcc.com/client-center/dtc-directories*. In these situations, shareholders need to obtain proof of ownership from the DTC participant through which the securities are held, as follows:

- If your broker or bank is a DTC participant, then you need to submit a written statement from your broker or bank verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 15, 2023.

- If your broker or bank is not a DTC participant, then you need to submit proof of ownership from the DTC participant through which the securities are held verifying that you continuously held the requisite number of ExxonMobil shares for the applicable time period preceding and including December 15, 2023. You should be able to find out who this DTC participant is by asking your broker or bank. If your broker is an introducing broker, you may also be able to learn the identity and telephone number of the DTC participant through your account statements because the clearing broker identified on your account statements will generally be a DTC participant. If the DTC participant that holds your shares knows your broker's or bank's holdings, but does not know your holdings, you need to satisfy the proof of ownership requirement by obtaining and submitting two proof of ownership statements verifying that for the applicable period preceding and including December 15, 2023, the required amount of securities were continuously held – one from your broker or bank, confirming your ownership, and the other from the DTC participant, confirming the broker or bank's ownership.

McKenzie Ursch
Page 3

SEC rules require that a shareholder who elects to use a representative for the purpose of submitted a proposal provide written documentation that must:

- identify the company to which the proposal is directed;
- identify the annual or special meeting for which the proposal is submitted;
- identify the shareholder as the proponent and identify the person acting on his or her behalf as his or her representative;
- include the shareholder's statement authorizing the designated representative to submit the proposal and otherwise act on his or her behalf;
- identify the specific topic of the proposal to be submitted;
- include the shareholder's statement supporting the proposal; and
- be signed and dated by the shareholder.

This Proposal lacks proper documentation of authority to the representative to submit the Proposal. To remedy the deficiency, you must provide documentation that meets the requirements described above.

*One Proposal Per Person*

Under Rule 14a-8(c), a person cannot submit more than one proposal to a company, either directly or indirectly. The SEC has long-recognized that multiple people controlled by a single entity or acting as a coordinated group or taking concerted actions may be treated as a single person under the SEC's rules. Congress created the concepts of "control" and "group" to protect against the evasion of disclosure requirements by people who collectively seek to change or influence control over a public company. Accordingly, the SEC takes an expansive view of who or what may qualify as a person.[1]

Relationships of control or the creation of a group among different shareholder proponents suggest that the proponents should be treated as a single "person." Again, each person may only submit one proposal. If multiple controlled entities or members of a group submit multiple proposals, it creates a deficiency in the submission of each of the proposals since the single "person" has submitted multiple proposals.

We believe your concerted work on the "Proxy Preview"[2] with As You Sow, Proxy Impact, Arjuna Capital and others should cause you and each of the aforementioned entities to be recognized as a single "person." Accordingly, there is a deficiency in your submission since, in addition to the Proposal, the following proposals have also been submitted by As You Sow and Proxy Impact for the 2024 annual meeting (see attached):

---

[1] As an example of the SEC's focus on the concept of "control," in the adopting release for the final rule relating to the "Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8" (https://www.sec.gov/files/rules/final/2020/34-89964.pdf), the SEC did not define "person" as a natural person or single entity. Instead, it stated that any entities and all persons under their control (emphasis added) will be treated as a "person" under Rule 14a-8(c).

As an example of the SEC's interpretation of the concept of a "group," in the adopting release for the final rule and guidance relating to the "Modernization of Beneficial Ownership Reporting" (https://www.sec.gov/files/rules/final/2023/33-11253.pdf), the SEC clarified that the joint or coordinated publication of soliciting materials with an activist investor could indicate "group" formation under Rule 13D.

[2] https://www.proxypreview.org/2023/report

McKenzie Ursch
Page 4

1. Report on Plastic Production Under SCS Scenario (As You Sow)
2. Report on Climate Impacts of Divestments (As You Sow)
3. Report on Racial and Gender Pay Gap (Proxy Impact)

This deficiency may be remedied by all but one of the above proposals being withdrawn. Otherwise, each of the proposals may be excluded from the proxy statement this year given they violate Rule 14a-8.

The increasing professionalization of anti-oil and gas activists submitting shareholder proposals has created a question of whether some proposals should be considered separate proposals from separate persons or represent multiple proposals from the same person. Many other types of coordination, such as funding relationships, joint service or employment relationships, joint publication of filed and unfiled solicitation materials, and other efforts that go beyond the creation, submission, or presentation of a shareholder proposal, can give rise to a control relationship or a "group" that should be treated as a single person to avoid the subversion of the shareholder proposal process. For example, if shareholders have an arrangement, understanding, or agreement—written or otherwise—to vote against certain directors or management proposals if their shareholder proposal(s) are not included in the proxy statement, the SEC would deem that "group" behavior.

The SEC currently asks proponents to self-identify. As a result, relationships among proponents are often not immediately clear to the company and hinder our ability to notify you of any deficiency in the Proposal. In this letter, we have only identified relationships between As You Sow, Proxy Impact, Arjuna Capital and Follow This that are available in the public domain. We encourage you to disclose any current or planned coordinated efforts or group relationships or activities so that we can work with you to find appropriate remedies that minimize costs to shareholders, to the proponents, and comply with the SEC's rules.

ExxonMobil believes information on these relationships and behavior is important in both the proposal submission process and the disclosure in the proxy statement since professional activists may not share the same incentives as other shareholders. For example, if activists are being paid for the submission of proposals, they are likely to be less sensitive than other shareholders to both the monetary costs and significant management burden created by responding to a large number of shareholder proposals. This belief has been confirmed by our shareholders, who have stated that information on an activist's activities is material to them and does influence their voting behavior similar to the information disclosed in a 13D filing on a group's investment strategy and plans for a company.

Accordingly, ExxonMobil believes that if you choose not to disclose any of these relationships or behaviors, you may be making a material omission in violation of the SEC's Rule 14a-9 antifraud rules. As such, we strongly encourage you to disclose now any relationships, actions or intended actions that you will undertake that could suggest you are coordinating with others in a concerted effort to influence the voting of securities either as a "group" or in violation of SEC rules. To the extent we later become aware of undisclosed relationships or actions in violation of these rules, we plan to share the information with shareholders and the SEC, as appropriate. We continue to believe this is an important issue as ExxonMobil regularly receives among the highest number of proposals of any U.S. company.

*Cure Period/Springing Deficiencies*

McKenzie Ursch
Page 5

The SEC's rules require that these defects we have identified be remedied, and any response to this letter must be postmarked or transmitted electronically to us no later than 14 calendar days from the date this letter is received. Please mail any response to me at ExxonMobil at the address shown above. Alternatively, you may send your response to me by email to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The failure to correct the deficiencies within this time period will provide the company with a basis to exclude the Proposal from the company's proxy statement for the 2024 annual meeting.

It is possible that, based on information not disclosed in your submission, or as a result of your future actions or information of which ExxonMobil otherwise becomes aware, additional deficiencies in the Proposal may arise. These "springing deficiencies" include actions contrary to Rule 14a-8, which limits each proponent to no more than one proposal per meeting, such as:

(1) submission of another proposal by you, including submissions under alternate names or aliases;
(2) joint publication with the proponent of another proposal of filed or unfiled solicitation materials, or other concerted actions together on one or more proxy matters, whether such actions are taken under common control or by the continuation or creation of a "group" (as discussed above); or
(3) the discovery by the company of "affiliate" or "control" relationships between you and another proponent, meaning that the multiple proponents should be considered a single "person."

Upon the discovery of a springing deficiency, the company will send you an additional deficiency notice similar to this letter. To the extent permitted by the timing of the springing deficiency, we will seek to provide an additional 14 calendar days from the date that the springing deficiency notice is received for any response. However, we are notifying you now of the potential for these springing deficiencies. To the extent that any may exist that have not been disclosed, you may address them with the company in the 14 calendar days from the date this letter is received.

The company reserves the right, as any current relationships among and activities of proponents come to light or as future group activities are started prior to the annual meeting, to provide you notice of the deficiency, consistent with SEC rules, and potentially either exclude the proposal from the proxy statement or, if already filed, cancel a vote on an ineligible matter. The later discovery of these deficiencies by the company, even if within 14 days of the mailing of the proxy or 14 days of the annual meeting, will not prevent the company from determining that you have been notified of the deficiency in a timely manner and excluding the Proposal or, if already filed, canceling a vote on an ineligible matter.

In light of the SEC Staff Legal Bulletin No. 14F dealing with co-filers of shareholder proposals, it is important to ensure that the Proponent, Arjuna Capital, has clear authority to act on behalf of all co-filers, including with respect to any potential negotiated withdrawal of the Proposal. Unless the Proponent can represent that it holds such authority on behalf of all co-filers, and considering SEC staff guidance, it will be difficult for us to engage in productive dialogue concerning this Proposal.

Note that under Staff Legal Bulletin No. 14F, the SEC will distribute no-action responses under Rule 14a-8 by email to companies and proponents. We encourage you, and all proponents and co-filers, to include an email contact address on any additional correspondence to ensure timely

McKenzie Ursch
Page 6

communication in the event the Proposal is subject to a no-action request.

Sincerely,



Enclosures

c:  Mark van Baal

McKenzie Ursch
Page 7

**Attached Proposals**

1. Report on Plastic Production Under SCS Scenario (As You Sow)
2. Report on Climate Impacts of Divestments (As You Sow)
3. Report on Racial and Gender Pay Gap (Proxy Impact)

**WHEREAS**: Plastic, with a lifecycle social cost at least ten times its market price, threatens the world's oceans, wildlife, and public health.[1] Concern about the growing scale and impact of global plastic pollution has elevated the issue to crisis levels.[2] Of particular concern are single-use plastics (SUPs), which make up the bulk of the 24-34 million metric tons of plastic ending up in waterways annually.[3] Without drastic action, this amount could triple by 2040.[4]

A shift from virgin plastic production is critical to reducing plastic pollution.[5] The Environmental Protection Agency's draft strategy to prevent plastic pollution calls for voluntary reduction in production.[6] A robust pathway addressing plastic pollution is presented in the widely respected *Breaking the Plastic Wave* report, which found that plastic leakage into the ocean can be reduced 80 percent under its System Change Scenario (SCS), but requires a significant absolute reduction of virgin SUPs.[7]

In response to the plastic pollution crisis and the necessity of reducing plastic production, countries and major packaging brands are beginning to drive reductions in plastic use.[8] This will affect the plastic production supply chain. BP has recognized the potential disruption global SUP reductions could have on the oil industry, finding a global SUP ban by 2040 would reduce oil demand growth by 60 percent.[9]

The Company faces growing risk from continued investment in virgin plastic production infrastructure. Several implications of the SCS, including a one-third absolute demand reduction of mostly of virgin SUPs and immediate reductions in new investment in virgin production, are at odds with ExxonMobil's planned investments. The Company has been identified as the largest global producer of SUP-bound polymers (11.5 million metric tons in 2021).[10] It has committed to increased use of recycled polymers but uses pyrolysis oil to generate plastic feedstock, a controversial process cited as inefficient and greenhouse gas-intensive with toxic byproducts and emissions, which may increase financial and reputational risk.[11]

Exxon's efforts to reduce plastic waste fail to address the potential for regulatory restrictions or a

---

[1] https://wwfint.awsassets.panda.org/downloads/wwf_pctsee_report_english.pdf, p.15
[2] https://www.unep.org/resources/pollution-solution-global-assessment-marine-litter-and-plastic-pollution
[3] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32019L0904&from=EN#page=8;
https://www.minderoo.org/plastic-waste-makers-index/
[4] https://www.nationalgeographic.com/science/article/plastic-trash-in-seas-will-nearly-triple-by-2040-if-nothing-done
[5] https://www.theguardian.com/environment/2021/jul/01/call-for-global-treaty-to-end-production-of-virgin-plastic-by-2040
[6] https://www.epa.gov/system/files/documents/2023-04/Draft_National_Strategy_to_Prevent_Plastic_Pollution.pdf, p.17
[7] https://www.pewtrusts.org/-/media/assets/2020/07/breakingtheplasticwave_report.pdf
[8] https://www.pbs.org/newshour/science/bold-single-use-plastic-ban-kicks-europes-plastic-purge-into-high-gear;
https://www.businessforplasticstreaty.org/
[9] https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/energy-outlook/bp-energy-outlook-2019.pdf#page=18
[10] https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf
[11] https://eandt.theiet.org/content/articles/2022/11/is-chemical-recycling-greenwashing;
https://theintercept.com/2023/09/28/braven-plastic-recycling-toxic-waste/

significant disruption in demand for virgin plastic, which could result in stranded assets.[12]

**RESOLVED:** Shareholders request that ExxonMobil issue a report, at reasonable cost and omitting proprietary information, addressing whether and how a significant reduction in virgin plastic demand, as set forth in *Breaking the Plastic Wave*'s System Change Scenario, would affect the Company's financial position and the assumptions underlying its financial statements.

**SUPPORTING STATEMENT:** Proponents recommend that, at Board discretion, the report include:
- Quantification of its polymer production for SUP markets;
- A summary of existing and planned investments that may be materially impacted by the SCS; and
- Disclosure of key metrics for chemical recycling processes, including inputs, outputs/yield, energy use, carbon and waste emissions, and any related measures taken to ensure safe operations.

---

[12] https://www.forbes.com/sites/scottcarpenter/2020/09/05/why-the-oil-industrys-400-billion-bet-on-plastics-could-backfire/?sh=6e099bd843fe

**WHEREAS:**  Transferring emissions from one company to another may reduce balance sheet emissions, but it does not mitigate company or stakeholder exposure to climate risk or contribute to the goal of limiting global temperature rise to 1.5 degrees Celsius (1.5°C). In the aggregate, upstream oil and gas assets are moving from operators with stronger climate targets and disclosures to operators with weaker climate commitments.[1] The Glasgow Financial Alliance for Net Zero warns that divestment from high-emitting assets can "have the unintended consequence of prolonging the life of high-emitting assets and even worsen emissions profiles."[2] It is therefore essential that oil and gas operators adhere to industry-wide best climate practices for asset transfers and acquisition, such as reporting transferred emissions and working with buyers to ensure transferred assets retain climate standards.

ExxonMobil reports an operational emissions reduction of 5.4% on an equity basis and 12.5% on an operated basis since 2016.[3] However, between 2017 and 2021, Exxon sold more assets than any other American oil and gas company except Chevron, ranking fourth globally among sellers.[4] Exxon does not disclose the climate impacts of its divestments. This reporting gap leaves investors with an incomplete understanding of Exxon's actions to mitigate its contribution to climate change.

To address this issue, Exxon should follow best practices for divestitures, including conducting climate-related due diligence on acquirers, including an evaluation of purchasers' emissions reporting and reduction targets. Doing so would allow Exxon to ensure that purchasers maintain or enhance existing climate standards for divested assets, reducing the likelihood that transferred assets would result in higher emissions.[5]

By increasing transparency and providing greenhouse gas emissions-related disclosures for asset transfers, Exxon can position itself as a leader on climate change, increase the legitimacy of the its climate targets, and provide essential information to its investors about its efforts to mitigate climate risk.

**RESOLVED:**  Shareholders request that ExxonMobil annually report on divestitures of assets with material climate impact, including whether each asset purchaser discloses its GHG emissions and has 1.5°C-aligned or other greenhouse gas reduction targets.

---

[1] https://business.edf.org/files/Transferred-Emissions-How-Oil-Gas-MA-Hamper-Energy-Transition.pdf, p.17
[2] https://assets.bbhub.io/company/sites/63/2022/10/GFANZ-2022-Progress-Report.pdf, p. 36
[3] https://corporate.exxonmobil.com/-/media/global/files/advancing-climate-solutions-progress-report/2023/2023-acs-ghg-data-supplement.pdf, p. 4
[4] https://business.edf.org/files/Transferred-Emissions-How-Oil-Gas-MA-Hamper-Energy-Transition.pdf, p. 22
[5] https://business.edf.org/wp-content/blogs.dir/90/files/Climate-Principles-Asset-Transfer.pdf, p.3

## Exxon Mobil: Racial and Gender Pay Gap Reporting, 2024

Whereas: Pay inequities persist across race and gender and pose substantial risks to companies and society. Black workers' median annual earnings represent 77 percent of white wages. The median income for women working full time is 84 percent that of men. Intersecting race, Black women earn 76 percent and Latina women 63 percent.[1] At the current rate, women will not reach pay equity until 2059, Black women in 2130, and Latina women in 2224.[2]

Citigroup estimates closing minority and gender wage gaps 20 years ago could have generated 12 trillion dollars in additional national income. PwC estimates closing the gender pay gap could boost Organization for Economic Cooperation and Development (OECD) countries' economies by 2 trillion dollars annually.[3]

Actively managing pay equity is associated with improved representation. Diversity in leadership is linked to superior stock performance and return on equity.[4] Minorities represent 64 percent of Exxon's global workforce and 28 percent of executives. Women represent 34 percent of the global workforce and 27 percent of executives.[5]

Best practice pay equity reporting consists of two parts:

1. *unadjusted* median pay gaps, assessing equal opportunity to high paying roles,
2. statistically *adjusted* gaps, assessing whether minorities and non-minorities, men and women, are paid the same for similar roles.

Exxon Mobil does not report quantitative unadjusted or adjusted pay gaps. About 50 percent of the 100 largest U.S. employers currently report adjusted gaps, and an increasing number of companies disclose unadjusted gaps to address the structural bias women and minorities face regarding job opportunity and pay.[6]

Racial and gender *unadjusted* median pay gaps are accepted as *the* valid way of measuring pay inequity by the United States Census Bureau, Department of Labor, OECD, and International Labor Organization. The United Kingdom and Ireland mandate disclosure of median gender pay gaps.[7] Exxon Mobil already provides this information for United Kingdom employees, and investors should be able to expect the same level of disclosure for all employers.

**Resolved:** Shareholders request Exxon Mobil report on both quantitative *median and adjusted* pay gaps across race and gender, including associated policy, reputational, competitive, and operational risks, and risks related to recruiting and retaining diverse talent. The report should be prepared at reasonable cost, omitting proprietary information, litigation strategy and legal compliance information.

Racial/gender pay gaps are defined as the difference between non-minority and minority/male and female *median* earnings expressed as a *percentage of non-minority/male* earnings (Wikipedia/OECD, respectively).

**Supporting Statement:** An annual report adequate for investors to assess performance could, with board discretion, integrate base, bonus and equity compensation to calculate:
- percentage median and adjusted gender pay gap, globally and/or by country, where appropriate
- percentage median and adjusted racial/minority/ethnicity pay gap, US and/or by country, where appropriate

1 https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-05.html - par_textimage_24
2 https://www.proxyimpact.com/_files/ugd/b07274_d8sf00b8786f4bd8bcf27a0c4bb66e35.pdf
3 Ibid.
4 Ibid.
5 https://corporate.exxonmobil.com/-/media/global/files/sustainability/social/investing-in-people-old.pdf
6 https://diversiq.com/which-sp-500-companies-disclose-gender-pay-equity-data/
7 https://www.proxyimpact.com/_files/ugd/b07274_d8sf00b8786f4bd8bcf27a0c4bb66e35.pdf

**Englande, Sherry M**

| | |
|---|---|
| **From:** | Julia Cedarholm ████████████████████ |
| **Sent:** | Wednesday, January 03, 2024 10:21 AM |
| **To:** | Shareholder Relations /SM |
| **Cc:** | Natasha Lamb; Englande, Sherry M |
| **Subject:** | RE: Exxon- Shareholder Proposal |
| **Attachments:** | Brian SL.pdf; Kimberly SL.pdf |
| | |
| **Categories:** | External Sender |

**External Email - Think Before You Click**

Dear Ms. Driscoll,

I confirm receipt of this email. Regarding your questions about ownership eligibility, I have attached updated broker verification letters stating that Kimberly and Brian have held the shares continuously for three years on the date the proposal was submitted.

We believe your argument that Arjuna should be considered a single "person" with As You Sow and Proxy Impact is groundless under Rule 14a-8(c).

We look forward to discussing the proposal with you at your convenience.

Best,
Julia

Julia Cedarholm
Senior Associate, ESG Research & Shareholder Engagement
She/her/hers
WWW.ARJUNA-CAPITAL.COM
████████████

**From:** Englande, Sherry M ██████████████████████ **On Behalf Of** Shareholder Relations /SM
**Sent:** Friday, December 22, 2023 5:32 PM
**To:** Julia Cedarholm ████████████████
**Cc:** Natasha Lamb ██████████████████; Englande, Sherry M ████████████████████
**Subject:** RE: Exxon- Shareholder Proposal

***Sent on behalf of Jennifer Driscoll:***

Please see the communication attached regarding your shareholder proposal.

**From:** Julia Cedarholm ████████████████
**Sent:** Thursday, December 14, 2023 3:19 PM
**To:** Shareholder Relations /SM ████████████████████

**Cc:** Natasha Lamb ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Exxon- Shareholder Proposal

Dear Mr. Morford,

Please find enclosed a shareholder proposal for Exxon's 2024 proxy statement. Please confirm receipt of this submission.

We look forward to discussing this important topic with you.

Best,
Julia



**ARJUNA CAPITAL**
ENLIGHTENED INVESTING

Julia Cedarholm
Senior Associate, ESG Research & Shareholder Engagement
She/her/hers
WWW.ARJUNA-CAPITAL.COM
▮▮▮▮▮▮▮▮▮▮

Disclaimer: This message and any attachments are intended solely for the use of the intended recipient(s) and may contain information that is privileged, confidential or proprietary. If you are not an intended recipient, please notify the sender, and then please delete and destroy all copies and attachments, as taking of any action on the information is prohibited. Unless specifically indicated, this message is not financial advice or a solicitation of any investment products or other financial product or service. Arjuna Capital is registered under the Investment Advisers Act of 1940, as amended. More information about Arjuna Capital is available on our Form ADV Part 2, available upon request.

| | |
|---|---|
| **From:** | Englande, Sherry M < ███████████████ > on behalf of Shareholder Relations /SM < ████████████ > |
| **Sent:** | Monday, January 22, 2024 3:01 PM |
| **To:** | Julia Cedarholm |
| **Cc:** | Natasha Lamb |
| **Subject:** | RE: Exxon- Shareholder Proposal - invitation to engagement |

Hi Julia –
In light of events over the last 24 hours, I will cancel our discussion currently scheduled for later this month.
Thank you
Sherry

**From:** Englande, Sherry M < ████████████████ > **On Behalf Of** Shareholder Relations /SM
**Sent:** Thursday, January 11, 2024 10:12 AM
**To:** Julia Cedarholm < █████████████ >
**Cc:** Natasha Lamb < ██████████████ >; Englande, Sherry M < ████████████████ >
**Subject:** RE: Exxon- Shareholder Proposal - invitation to engagement

Hi Julia –
Thank you for your patience and for the offer of these windows for engagement.
Our calendars align for a call on January 30 from 3:30-4:00pm ET / 2:30-3:00pm CT.
I'll send a meeting notice with Zoom link for that day and time and we'll look forward to talking with you soon.
Thank you for engaging with us.
Sherry

**From:** Julia Cedarholm < ███████████████ >
**Sent:** Tuesday, January 09, 2024 9:44 AM
**To:** Shareholder Relations /SM < ████████████████ >
**Cc:** Natasha Lamb < ██████████████ >; Englande, Sherry M < ████████████████ >
**Subject:** RE: Exxon- Shareholder Proposal - invitation to engagement

**External Email - Think Before You Click**

Hi Sherry,

Happy New Year!

Unfortunately, those dates/times do not work for us. I'm including some additional dates and times below. Do one of these work for you all?
- 1/29 from 12:30-2pm ET
- 1/30 from 2:30-4pm ET
- 1/31 from 10-11am ET

Thank you,
Julia

1

App.027

Julia Cedarholm
Senior Associate, ESG Research & Shareholder Engagement
She/her/hers
WWW.ARJUNA-CAPITAL.COM

████████████████

**From:** Englande, Sherry M <████████████████████████> **On Behalf Of** Shareholder Relations /SM
**Sent:** Tuesday, January 9, 2024 10:20 AM
**To:** Julia Cedarholm <████████████████>
**Cc:** Natasha Lamb <████████████████>; Englande, Sherry M <████████████████████>
**Subject:** RE: Exxon- Shareholder Proposal - invitation to engagement

Hello Natasha & Julia – Happy New Year!

We would like to invite you and the proponent to engagement to discuss the proposal you've submitted for our 2024 annual shareholder meeting.

Can you join us for a call either:

Thursday, January 11, 2024 from 10:30-11:00am ET / 9:30-10:00am CT, or
Monday, January 15, 2024 from 3:30-4:00pm ET / 2:30-3:00pm CT

If one of these days/times works for you, I'd be glad to send you a meeting notice with Zoom link to block our calendars. Thank you and we look forward to talking with you soon.
Sherry

**Sherry M. Englande**
ESG Manager
Investor Relations

**Exxon Mobil Corporation**
████████████████████
████████████████

(please note new telephone and physical address)

**From:** Julia Cedarholm <████████████████>
**Sent:** Thursday, December 14, 2023 3:19 PM
**To:** Shareholder Relations /SM <████████████████████>
**Cc:** Natasha Lamb <████████████████>
**Subject:** Exxon- Shareholder Proposal

Dear Mr. Morford,

Please find enclosed a shareholder proposal for Exxon's 2024 proxy statement. Please confirm receipt of this submission.

We look forward to discussing this important topic with you.

Best,
Julia

App.028



ENLIGHTENED INVESTING

Julia Cedarholm
Senior Associate, ESG Research & Shareholder Engagement
She/her/hers
WWW.ARJUNA-CAPITAL.COM

Disclaimer: This message and any attachments are intended solely for the use of the intended recipient(s) and may contain information that is privileged, confidential or proprietary. If you are not an intended recipient, please notify the sender, and then please delete and destroy all copies and attachments, as taking of any action on the information is prohibited. Unless specifically indicated, this message is not financial advice or a solicitation of any investment products or other financial product or service. Arjuna Capital is registered under the Investment Advisers Act of 1940, as amended. More information about Arjuna Capital is available on our Form ADV Part 2, available upon request.

3



January 29, 2024

Ferrell M. Keel
Jones Day
████████████████████
████████████████

Dear Mr. Keel,

Arjuna Capital on behalf of Kimberly Indresano and Brian Robert Romer (the shareholders) hereby withdraws the shareholder proposal on greenhouse gas emissions submitted on December 14, 2023 for the 2024 annual general meeting of Exxon Mobil.  Arjuna and the shareholders waive the right to sue the company or complain to the SEC if the proposal does not appear on the proxy. Arjuna and the shareholders will not refile the proposal with Exxon at any time in the future, and will not present the proposal on the floor of an annual meeting.

Sincerely,

Natasha Lamb
Managing Partner
Arjuna Capital

Cc:
James E. Parsons, Exxon Mobil
McKenzie Ursch, Follow This
Mark van Baal, Follow This
Veronica Renzi, Foley Hoag



January 29, 2024

Ferrell M. Keel
Jones Day

Dear Mr. Keel,

Follow This hereby withdraws the shareholder proposal on greenhouse gas emissions submitted on December 15, 2023 for the 2024 annual general meeting of Exxon Mobil.  Follow This waives the right to sue the company or complain to the SEC if the proposal does not appear on the proxy. will not refile the proposal with Exxon at any time in the future, and will not present the proposal on the floor of an annual meeting.

Sincerely,

McKenzie Ursch
Head of Legal
Follow This

CC:

James E. Parsons, Exxon Mobil
Natasha Lamb, Arjuna Capital
Mark van Baal, Follow This
Veronica Renzi, Foley Hoag

⚠ Caution
As of: February 12, 2024 3:54 PM Z

# Bazzrea v. Mayorkas

United States District Court for the Southern District of Texas, Galveston Division

June 12, 2023, Decided; June 12, 2023, Filed, Entered

No. 3:22-cv-265

**Reporter**
2023 U.S. Dist. LEXIS 101876 *; __ F.Supp.3d __

MICHAEL BAZZREA, ET AL., PLAINTIFFS, v.
ALEJANDRO MAYORKAS, ET AL., DEFENDANTS.

## Core Terms

moot, vaccination, requests, adverse action, mandates,
religious-accommodation, rescinded, reenlist, plaintiffs',
courts, voluntary-cessation, capable-of-repetition-yet-
evading-review, recissions, enlisted, declare, enjoin

## Case Summary

### Overview

HOLDINGS: [1]- Denials of plaintiffs' requests then had
no effect on the plaintiffs' rights because the mandates
had been rescinded, so there was no reason for the
court to declare them unconstitutional or unlawful, nor
enjoin the implementation of the mandates. Relatedly,
the religious-accommodation requests were to avoid the
mandates' enforcement. The voluntary cessation
mootness exception did not apply as the recissions
eliminated the controversy and were not simply litigation
posturing; also, the capable of repetition yet evading
review exception did not apply as the case did not meet
the exception's duration requirement and there was no
reasonable expectation that the plaintiffs would be
subjected to the vaccine mandates again.

### Outcome

Case dismissed.

## LexisNexis® Headnotes

Civil Procedure > ... > Justiciability > Case &
Controversy Requirements > Actual Controversy

Evidence > Burdens of Proof > Allocation

Constitutional Law > The Judiciary > Case or
Controversy > Advisory Opinions

**HN1[⬇]** **Case & Controversy Requirements, Actual
Controversy**

The requirement that jurisdiction be established as a
threshold matter is inflexible and without exception. A
court should dismiss for lack of subject matter
jurisdiction if the court lacks the statutory or
constitutional power to adjudicate the case. Sua sponte
dismissal is mandatory when a court discovers that it
lacks subject-matter jurisdiction. The party asserting
jurisdiction bears the burden of proof. Federal courts
have jurisdiction over a claim between parties only if the
plaintiff presents an actual case or controversy. U.S.
Const. art. 3, § 2, cl. 1.

Civil Procedure > ... > Justiciability > Case &
Controversy Requirements > Actual Controversy

**HN2[⬇]** **Case & Controversy Requirements, Actual
Controversy**

The many doctrines that have fleshed out that actual
controversy requirement standing, mootness, ripeness,
political question, and the like are founded in concern
about the proper and properly limited role of the courts
in a democratic society. To test whether the party
asserting jurisdiction has met its burden, a court may
rely upon: (1) the complaint alone; (2) the complaint
supplemented by undisputed facts evidenced in the
record; or (3) the complaint supplemented by
undisputed facts plus the court's resolution of disputed
facts.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Judgments > Summary Judgment

### HN3[⤓] Subject Matter Jurisdiction, Jurisdiction Over Actions

When examining a factual challenge to subject matter jurisdiction, which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority to weigh the evidence and satisfy itself as to the existence of its power to hear the case. But when the factual challenge does go to the merits, the motion is properly treated as one for summary judgment.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

### HN4[⤓] Standing, Injury in Fact

For a case or controversy to exist, a plaintiff must have suffered an injury in fact, which must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Civil Procedure > ... > Justiciability > Standing > Personal Stake

### HN5[⤓] Standing, Injury in Fact

To allege a particularized injury, the plaintiff must establish that it has a personal stake in the alleged dispute. The injury must not be conjectural or hypothetical.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

### HN6[⤓] Standing, Injury in Fact

Traceability requires a causal connection between the injury and the conduct complained of. Redressability requires a likelihood rather than mere speculation that a favorable decision will redress the injury. If in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case is generally moot.

Civil Procedure > ... > Justiciability > Mootness > Real Controversy Requirement

Constitutional Law > ... > Case or Controversy > Standing > Elements

### HN7[⤓] Mootness, Real Controversy Requirement

Article III standing at the start of litigation is not enough the controversy must remain live throughout the suit's existence. No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.

Civil Procedure > ... > Class Actions > Class Members > Named Members

Civil Procedure > ... > Justiciability > Mootness > Real Controversy Requirement

### HN8[⤓] Class Members, Named Members

A purported class action becomes moot when the personal claims of all named plaintiffs are satisfied and no class has been certified. Further, when a case is moot, it deprives the court of jurisdiction to consider

motions for intervention.

Constitutional Law > ... > Case or Controversy > Standing > Elements

*HN9*[⬇] **Standing, Elements**

The possibility either of no promotion or other future adverse actions is speculative and hypothetical and so not the type of actual, imminent, concrete, and particularized harm that Article III requires.

Civil Procedure > ... > Justiciability > Mootness > Voluntary Cessation Exception

*HN10*[⬇] **Mootness, Voluntary Cessation Exception**

The voluntary cessation exception to mootness requires courts to examine defendant induced mootness with caution. Generally, voluntary conduct does not moot a case unless the defendant demonstrates that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. When considering whether voluntary conduct moots a case, courts strive to determine whether the defendant's actions are simply litigation posturing or actually extinguish the controversy. But when a governmental entity, rather than another kind of defendant, voluntarily ceases possibly wrongful conduct, courts extend the defendant some solicitude. So, without evidence to the contrary, courts assume that formally announced changes to official governmental policy are not mere litigation posturing. Among other things, the government's ability to reimplement the statute or regulation at issue is insufficient to prove the voluntary cessation exception.

Civil Procedure > ... > Justiciability > Mootness > Evading Review Exception

Constitutional Law > ... > Case or Controversy > Mootness > Conduct Capable of Repetition

*HN11*[⬇] **Mootness, Evading Review Exception**

To fit within the capable of repetition yet evading review exception to mootness, a plaintiff must show: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. This exception only applies in exceptional situations like strikes, pregnancies, or elections, when termination of the causal event or condition may preclude challenge to state policies that have had their impact and that continue in force, unabated and unreviewed.

Civil Procedure > ... > Justiciability > Mootness > Evading Review Exception

Constitutional Law > ... > Case or Controversy > Mootness > Conduct Capable of Repetition

*HN12*[⬇] **Mootness, Evading Review Exception**

In the typical case where the capable-of-repetition-yet-evading-review exception applies, the challenged action is short enough to evade review because the causal or underlying event or condition—not the challenged regulation or law—is too short to be fully litigated. (and). For example, pregnancies, elections, and nonresident status are by nature short-duration conditions or events.

Governments > Courts > Authority to Adjudicate

*HN13*[⬇] **Courts, Authority to Adjudicate**

And courts are not in the business of pronouncing that past actions with have no demonstrable continuing effect were right or wrong.

**Counsel:** **[*1]** For Michael Bazzrea, Plaintiff: Dale Saran, LEAD ATTORNEY, PRO HAC VICE, Dale F. Saran, LLC, Olathe, KS USA; Travis Wilson Miller, LEAD ATTORNEY, None, Austin, TX USA; Brandon Johnson, PRO HAC VICE, Dallas, TX USA; J. Andrew Meyer, PRO HAC VICE, Finn Law Group, P.A., St. Petersburg, FL USA; Simon Peter Serrano, PRO HAC VICE, Silent Majority Foundation, Pasco, WA USA.

For Sabrina Wilder, Plaintiff: Dale Saran, LEAD ATTORNEY, PRO HAC VICE, Dale F. Saran, LLC,

Olathe, KS USA; Brandon Johnson, PRO HAC VICE, Dallas, TX USA; J. Andrew Meyer, Finn Law Group, P.A., St. Petersburg, FL USA; Simon Peter Serrano, PRO HAC VICE, Silent Majority Foundation, Pasco, WA USA; Travis Wilson Miller, None, Austin, TX USA.

For Courtney Cheatum, Plaintiff: Dale Saran, LEAD ATTORNEY, PRO HAC VICE, Dale F. Saran, LLC, Olathe, KS USA; Travis Wilson Miller, LEAD ATTORNEY, None, Austin, TX USA; Brandon Johnson, PRO HAC VICE, Dallas, TX USA; Simon Peter Serrano, PRO HAC VICE, Silent Majority Foundation, Pasco, WA USA.

For Timothy Jorden, Caleb Wadsworth, Plaintiffs: Dale Saran, LEAD ATTORNEY, PRO HAC VICE, Dale F. Saran, LLC, Olathe, KS USA; Brandon Johnson, PRO HAC VICE, Dallas, TX USA; Simon Peter Serrano, PRO HAC [*2] VICE, Silent Majority Foundation, Pasco, WA USA; Travis Wilson Miller, None, Austin, TX USA.

For Alejandro Mayorkas, in his official capacity as Secretary of the U.S. Department of Homeland Security, Linda Fagan, in her official capacity as Commandant of the United States Coast Guard, Lloyd J. Austin III, in his official capacity as Secretary of the U.S. Department of Defense, Janet Woodcock, in her official capacity as Acting Commissioner of the U.S. Food and Drug Administration, Defendants: Cassandra Snyder, Jody D. Lowenstein, PRO HAC VICE, Civ, Washington, DC USA.

For Hannah Allen, Lars Anderson, Cassidy Andrews, David Andrizzi, Chad Atwood, Michael Bannon, Rachel Beckwith, James Berry, Eileen Best, Marc Block, Darrel Boyles, Christian Brewer, Jeffrey Broom, Nicholas Brozusky, Mark Byrd, Heather Caldwell, Josh Candelaria, David Carrier, Kyle Carter, Richard Chapman, Nathan Chatwin, Michael Chynoweth, Alexis Colasurdo, Brennen Coles, Brandon Collins, James Copeland, Chad Coppin, Benjamin Coutts, Alan Crawford, Ryan Curry, Zachary Curry, Noah Denend, Christopher Devine, Antonio Diaz, Bazzrea Intervenor, Paul Diedricks, Stephanie Diedricks, Andrew Donadio, Nicole Edwards, Kennedy Eilerman, [*3] Kalena Exner, Michael Fambro, James Fielder, Brandi Flinn, Berlin Gabretti, Luke Galat, John Garland, Brandon Garofalo, Laura Garofalo, Dan Gomez, Colleen Griffin, Amy Haley, Josh Handeland, Richard Hardwick, Christopher Harkins, Joshua Harris, DANIEL HAUSER, James Head, Craig Hermiller, Michael Hernon, Sean Hill, Joshua Hudson, Shango Indomitus, Connor Jeanneret, Ian Jobs, Earl Johnson, Jessie Johnson, Richard Joy, Courtney Keith, Laurie Kennedy, Jong Kim, Jodie Knox,

Brian Kudrle, Kelcie Laroche, Andrew Larsen, John Lazear, Alina Lehman, Georgette Lopez, Heman Madrid, Hal Martin, Elizabeth Mastorides, Charles Mathis, Jackson McGinnis, Christopher Meedel, James Merrill, Caleb Miller, Zachary Morand, Daniel Morrissey, Emily Muhlenbeck, Justin Munk, Andre Murphy, Corley Myres, Margaret Nakoa, MATTHEW NEWKIRK, Shane Nolan, Nicholas Poehler, Matthew Powers, Michael Price, Casey Reynolds, Tyler Reynolds, Bettina Richardson, Edward Richardson, Christopher Roberts, Ricardo Rodriguez Valentin, Shelby Rodriguez, Robert Rogers, Heather Sands, Roby Scherler, Brett Schmitt, A. J. Schur, Ryan Shaw, Zachary Stetzel, Parker Sublette, Zach Sullivan, Jason Thorne, Jeffrey Tucker, Skyler Vyse, Jason [*4] Wallace, Charles Watson III, Bradley Weikert, Jacob Wharton, Jacob White, Tyler Wilkinson, Steven Wojick, Tabitha Woolery, Intervenor Plaintiffs: Dale Saran, LEAD ATTORNEY, Dale F. Saran, LLC, Olathe, KS USA.

For Michael Akey, Austin Albright, Elizabeth Albritton, Ashley Anderson, Nathaniel Anderson, Martin Andrada, Stanley Andriski, Stephanie Aninos, Zachary Atchison, Altara Avery, Justin Baker, Brett Barker, William Beckham, Mary Bender, Scott Bleicken, Noah Bodey, Jenny Bone, William Brennan, Jadeon Brooks, Dean Capps, ADAM CARR, Adrian Chuquillangui, Christopher Collins, Jeff Daily, Adam DeLano, Richard Deleon, Daniel DeRito, Maikalani Dias, TAYLOR DICKINSON, Edward DiPierro, Paul Dorpema, Lauren Emmons, Jonathan Fassnacht, Jason Fields, John Flores, Stephen Fortin, Carrie Gagnon, Joseph Garofalo, Alec Gaudin, Margarito Gonzales, Jr., Nicole Goodrich, Jentzen Green, Robert Haden, Michael Hamaide, Robyn Hamilton, Brooks Hargrove, Matthew Heaton, Dylan Hennigan, Timothy Hicks, Thomas Higham, Justin Jerry, Carlton Kennedy, Christine Kennedy, Andrew Kucharczyk, Ian LeBlanc, Natalie Little, Brett Mangiaracina, Ken Marks, Taylor McDevitt, Jason Mozingo, Joshua Muhlenbeck, Christopher [*5] Musgrave, Timothy Navarro, Haley Nix, Isaak Olson, Caleb Peacock, Stephen Prevatt, Dion Purcell, Carlos Quintero, Blake Rausch, Robert Rendon, Stephen Ricardo, Adam Rieck, Angel Rios, Andrew Ross, Jason Ruffenach, Joshua Schweinsberg, Richard Sheill, Matthew Shelton, Jason Shiflett, Kathleen Smith, Brittney Sonnier, Eason Spinelli, Stephen Spotts, Timothy Stamm, Jacob Stonecipher, Benaia Stowell, Jeremiah Strombeck, Daniel Szuba, Melinda Thibodeau, Jeremy Troyer, Simon Truman, Robert Turner, Pedro Vargas, Leonardo Vega, Brett Watts, Christiane Weber, Mitchell Weimann, Paul Winchell,

2023 U.S. Dist. LEXIS 101876, *5

Benjamin Wolhaupter, Clay Yancey, Matthew Yee, Christy York, Intervenor Plaintiffs: Simon P Serrano, LEAD ATTORNEY, Silent Majority Foundation, Pasco, WA USA.

**Judges:** JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JEFFREY VINCENT BROWN

# Opinion

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE:*

Before the court is the parties' briefing on mootness. Dkts. 76, 77, 78. The court holds that the case is moot. It is dismissed for lack of jurisdiction.

## I. Background

### A. The Complaint

On July 25, 2022, five Coast Guard members[1] sued—on behalf of themselves and a yet-uncertified class[2]—the Secretary of [*6] Defense, the Secretary of Homeland Security, the Commandant of the Coast Guard, and the Acting Commissioner of the FDA. Dkt. 1. The plaintiffs allege violations of (1) the Religious Freedom Restoration Act ("RFRA"), (2) the First Amendment's Free Exercise Clause, (3) the Fifth Amendment Due Process Clause ("substantive due process"), (4) the Fifth Amendment Due Process Clause ("procedural due process"), (5) informed consent laws, and (6) the Administrative Procedure Act ("APA"). *Id.* ¶¶ 112-183.

Each plaintiff has refused to comply with the Department of Defense's and Coast Guard's mandates to receive a COVID-19 vaccine, alleging that vaccination conflicts with his or her sincerely held religious beliefs. *Id.* ¶¶ 1-2, 11-25. All the plaintiffs have submitted religious-accommodation requests that the Coast Guard did not grant. *Id.* ¶ 3. They allege various forms of discrimination because of their vaccination status. *Id.*

The plaintiffs request that the court (1) declare that the defendants' broad denials of religious-accommodation requests violate the Constitution and RFRA, (2) declare that the Department of Defense's and the Coast Guard's mandates are unconstitutional and unlawful, (3) enjoin the mandates' implementation, and (4) enjoin any adverse actions that result from the plaintiffs' religious-accommodation requests or the denials [*7] of such requests. *Id.* ¶ 7.

### B. Post-Complaint Developments

Soon after the complaint was filed, two plaintiffs—Bazzrea and Cheatum—became fully vaccinated in compliance with the Coast Guard's mandate. Dkt. 22-5 ¶¶ 21-22, 26-28. Although the other three plaintiffs remain unvaccinated, they continue to serve with the Coast Guard. And one plaintiff—Jorden—was discharged from the Coast Guard at the end of his enlistment period.[3] Dkts. 41-1 ¶ 4; 77-1 ¶ 6.

On December 12, 2022, the court stayed proceedings for thirty-five days while Congress considered legislation that would direct the Secretary of Defense to rescind the memorandum requiring COVID-19 vaccination for service members. Dkt. 71. Eleven days later, Congress passed Section 525 of the James M. Inhoffe National Defense Authorization Act for Fiscal Year 2023 ("NDAA"). Pub. L. No. 117-263, § 525, 136 Stat. 2395. Section 525 directed the Secretary of Defense to rescind the memorandum that required COVID-19 vaccination for service members.

Around three weeks later, the Secretary of Defense rescinded COVID-19 vaccination requirements for military, National Guard, and Ready Reserve service members. Dkt. 72-1. The Secretary stated that no Armed Forces service members "shall be separated solely on the basis of their refusal to receive the COVID-

---

[1] The plaintiffs are Master Chief Michael Bazzrea, Operations Specialist (Second Class) Sabrina Wilder, Petty Officer First Class Courtney Aaron Cheatum, Marine Enforcement Specialist (Third Class) Timothy Jorden, and Lieutenant Caleb Wadsworth. Dkt. 1 ¶¶ 11-23.

[2] The plaintiffs have two pending motions to intervene for 228 putative plaintiff-intervenors and a pending motion for class certification. Dkts. 23, 28, 38.

---

[3] The parties dispute whether Jorden was eligible to reenlist. Dkts. 77 at 12 n.8; 41-1 ¶ 4

19 vaccination if they sought an accommodation on religious, [*8] administrative, or medical grounds," promised to "update the records of such individuals to remove any adverse actions solely associated with denials of such requests, including letters of reprimand," and announced that the military would stop reviewing accommodation requests and appeals stemming from the rescinded COVID-19 vaccination mandate. *Id.* at 2. While retracting the COVID-19 vaccination mandate, the Secretary emphasized that the Department "retain[ed] . . . other standing Departmental policies on immunization, so that commanders may consider immunization status 'in making deployment, assignment, and other operational decisions, including when vaccination is required for travel to, or entry into, a foreign nation.'" *Roth v. Austin*, 62 F.4th 1114, 1119 (8th Cir., 2023) (quoting Dkt. 72-1).

The next day, the Coast Guard eliminated its COVID-19 vaccination requirement. Dkt. 72-2. It also stopped involuntary administrative separations caused by a member's refusal to vaccinate against COVID-19. *Id.* The Coast Guard later cancelled two other policies: one precluded unvaccinated enlisted members and officers from receiving permanent change-of-station orders, and the other imposed vaccination requirements for command positions and training and education [*9] courses. Dkt. 72-3. The Coast Guard also released other guidance indicating that it

> (1) cancelled assignment and training restrictions related to COVID-19 vaccination status, Dkt. 72-4;
>
> (2) cancelled officer separations based solely on COVID-19 vaccine refusal, *id.*;
>
> (3) no longer prohibits unvaccinated members from executing permanent change-of-station orders, *id.*;
> (4) does not consider "failure to comply with the COVID-19 vaccination mandate alone [to] render [a] member ineligible to reenlist or extend," Dkt. 72-5;
>
> (5) cancelled "all assignment, boards and panels, and training restrictions" on the basis of COVID-19 vaccination status, *id.*;
>
> (6) does not consider "the refusal of the COVID-19 vaccination alone [to] require the withholding of advancement" for enlisted members, *id.*;
>
> (7) encourages members whose advancement was previously withheld should compete in 2023 advancement panels, *id.*; and

(8) requires commanding officers to amend any previous recommendations against advancement based solely on refusal to be vaccinated, *id.*

After the Coast Guard released this guidance, the court ordered the parties to submit additional briefing addressing the question of mootness. Dkt. 73. The parties complied. [*10] Dkts. 76, 77, 78. The court now considers whether it has jurisdiction.

## II. Legal Standard

### A. Case or Controversy

**HN1[⬆]** "The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception." *Keyes v. Gunn*, 890 F.3d 232, 235 (5th Cir. 2018) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). A court should dismiss for lack of subject-matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate the case." *Walmart Inc. v. United States DOJ*, 21 F.4th 300, 307 (5th Cir. 2021) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). "[S]ua sponte dismissal is mandatory when a court discovers that it lacks subject-matter jurisdiction." *Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) (citing Fed. R. Civ. P. 12(h)(3)). The party asserting jurisdiction bears the burden of proof. *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 534 (5th Cir. 2017). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. U.S. Const. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001) (en banc).

**HN2[⬆]** "The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541-42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)). To test whether the party asserting jurisdiction has met its burden, a court may rely upon "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented [*11] by undisputed facts plus the court's resolution of disputed facts." *In re S. Recycling, L.L.C.*, 982 F.3d 374,

379 (5th Cir. 2020) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). Here, the court does not resolve any factual issues—it relies only on the complaint supplemented by undisputed facts evidenced in the record.

*HN3*[⬆] "When examining a factual challenge to subject-matter jurisdiction, which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority 'to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *U.S. ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575, 583 (S.D. Tex. 2015) (Rosenthal, J.) (quoting *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)). "But when the factual challenge does go to the merits, the motion is properly treated as one for summary judgment." *U.S. ex rel. Sonnier*, at 584.

This jurisdictional examination does not go to the merits—the court need not and does not reach whether the mandate, the religious-accommodation-request-denial process, or the adverse actions against the plaintiffs were unconstitutional or unlawful. There is no need for discovery.

### 1. Standing

*HN4*[⬆] For a case or controversy to exist, a plaintiff must have suffered an injury in fact, which "must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010)).

*HN5*[⬆] To allege a particularized [*12] injury, the plaintiff must establish that it has a "personal stake" in the alleged dispute. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)). The injury must not be "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal citations and quotations omitted).

*HN6*[⬆] Traceability requires a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 561. Finally, redressability requires a likelihood rather than mere speculation that a favorable

decision will redress the injury. *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)). "[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case is generally moot." *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 796, 209 L. Ed. 2d 94 (2021).

### 2. Mootness

*HN7*[⬆] Article III standing at the start of litigation is not enough—the controversy must remain live throughout the suit's existence. *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Yarls*, 905 F.3d at 909 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013)) (internal quotation omitted).

### III. Analysis

The defendants argue this case is moot because (1) the challenged vaccination requirement has been repealed and there is no remaining available relief and (2) the voluntary-cessation [*13] exception to mootness does not apply. Dkt. 76. The plaintiffs make several arguments in response: (1) there are continuing issues and accompanying avenues of relief, (2) the recission of the policy falls under the voluntary-cessation exception to mootness, and (3) the policy recission falls under the capable-of-repetition-yet-evading-review standard. Dkt. 77.

### A. Mootness

In their briefing on mootness, the plaintiffs argue that relief for their claims is still available, and thus the case is not moot. *Id.* at 14.

As set forth above, the plaintiffs urge that the court (1) declare that the Department of Defense's and the Coast Guard's mandates are unconstitutional and unlawful, (2) enjoin the implementation of the mandates, (3) declare that the defendants' broad religious-accommodation-request denials violated the Constitution and RFRA, and (4) enjoin any adverse actions that are a result of the

plaintiffs' religious-accommodation requests or the denials of such requests. Dkt. 1 ¶ 7. In their mootness briefing, the plaintiffs argue that the availability of this relief and RFRA damages prevent a mootness ruling.[4] Dkt. 77 at 7-16.

The mandate recissions have eliminated the actual controversy—the [*14] court cannot provide effectual relief and thus the plaintiffs' claims are moot.

## 1. Mandates and Religious-Accommodation Requests

The mandates have been rescinded, so there is no reason for the court to declare them unconstitutional or unlawful, nor enjoin the implementation of the mandates. Relatedly, the religious-accommodation requests were to avoid the mandates' enforcement. As the mandates are no longer in effect or enforceable, denials of those requests currently have no effect on the plaintiffs' rights.[5] The court cannot provide any remedy. *See Navy Seal 1 v. Austin*, Nos. 22-5114, 22-5135, 2023 U.S. App. LEXIS 5843, 2023 WL 248297 (D.C. Cir. Mar. 10, 2023) (per curiam) (dismissing appeals and vacating judgments in a case challenging the

Department of Defense mandate and the religious-accommodation-request-denial process as moot).

## 2. Adverse Actions Against the Plaintiffs

The plaintiffs argue that they have suffered and still suffer adverse actions as a result of their religious-accommodation requests or denials. Dkt. 77 at 7-16. Accordingly, they argue that their claims cannot be moot because the court can provide relief. *Id.* But none of the named plaintiffs are currently suffering adverse actions that convince the court that it still has jurisdiction.

### a. Bazzrea and Cheatum

Bazzrea and Cheatum [*15] were both vaccinated and have suffered no adverse actions against them. Dkt. 77 at 12 n.8. The court can offer no relief that would redress their alleged injuries. They do not have a "legally cognizable interest in the outcome" of this lawsuit and thus their claims are moot. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008).

### b. Jorden

Jorden is no longer in the Coast Guard. Dkts. 76 at 9; 77 at 12 n.8. The plaintiffs argue that Jorden's refusal to receive the vaccine made him ineligible to reenlist. Dkt. 77 at 12 n.8. In contrast, the Coast Guard claims that Jorden was originally ineligible to reenlist due to a violation unrelated to the COVID-19 vaccine but was later granted a waiver that permitted him to reenlist. Dkt. 41-1 ¶ 4. The court need not resolve this dispute—regardless of the circumstances, Jorden did not reenlist, and the Coast Guard gave him "an honorable characterization of service upon discharge with a separation code indicating end of enlistment." *Id.* According to the plaintiffs, Jorden has "negative counseling, lower marks on enlisted[-]evaluation reports, or other adverse paperwork" in his personnel record due to his refusal to get vaccinated. Dkt. 77-1 ¶ 6.

To the extent the plaintiffs argue that Jorden was not permitted [*16] to reenlist due to his vaccine status, the court cannot provide effectual relief—the Coast Guard has indicated that if Jorden would like to reenlist now, he is free to do so. Dkts. 72-5, 78 at 2.

As far as negative paperwork goes, there is no clear

---

[4] The plaintiffs also argue that "declaratory relief can serve as a precursor to monetary relief, which precludes this case from being moot." Dkt. 77 at 16. But because declaratory relief is not appropriate—there is not a controversy of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941))—the court need not reach whether declaratory relief can serve as a precursor to monetary relief here. Further, the single case the plaintiffs cite in support of this argument is a Sixth Circuit case that discusses declaratory relief as a precursor to monetary relief in the context of class certification, Fed. R. Civ. P. 23(b)(2), and declaratory judgments in class actions—none of which applies here. *See* Dkt. 77 at 16 (citing *Doster v. Kendall*, 54 F.4th 398, 426 (6th Cir. 2022)).

[5] The plaintiffs additionally argue that this lawsuit is not moot because the defendants have not eliminated the automated "digital tools" used to generate the automatic denials of religious-accommodation requests. Dkt. 77 at 10. These claims are moot for the same reason—because the mandates have been rescinded, denials of religious-accommodation requests related to the vaccine mandate currently have no effect on the plaintiffs' rights.

argument as to how these records currently affect Jorden. He no longer serves with the Coast Guard and has no apparent complaints about how that paperwork affected the honorable characterization of his discharge. As Jorden no longer has a "personal stake in the outcome of the lawsuit," his claims are moot. *Env't Conservation Org*, 529 F.3d at 527.

### c. Wadsworth and Wilder

As of March 7, 2023, Wadsworth and Wilder (and perhaps other named plaintiffs[6]) had allegedly adverse CG-3307s[7] in their personnel files. Dkt. 77-1 ¶¶ 7-8. According to a Coast Guard bulletin, the CG-3307s were to be removed by March 31, which has since passed. *ALCGPSC 024/23 - Correcting Military Records (COVID-19)*, U.S. Coast Guard (Feb. 27, 2023, 4:13 PM EST), https://perma.cc/QGV8-5FKG. The Coast Guard has notified the court—and the plaintiffs do not dispute—that these CG-3307s have been removed.[8] Thus, this alleged injury has been remedied.

### d. Potential Plaintiffs

The plaintiffs make claims on behalf of the individuals [*17] that have attempted to join this lawsuit via class certification and intervention. Dkt. 77 at 12-14. Primarily, they focus on injuries of discharge, ineligibility for reenlistment, lost bonuses, denied GI Bill and Veterans Administration benefits, negative counseling, and discharge from the Coast Guard Academy. *Id.* But these individuals are nonparties to this case, and generally, "*HN8*[↑] a purported class action becomes moot when the personal claims of all named plaintiffs are satisfied and no class has been certified." *Murray v. Fidelity Nat. Fin., Inc.*, 594 F.3d 419, 421 (5th Cir. 2010) (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir. 1981)). Further, when a case is moot, it deprives the court of jurisdiction to consider motions for intervention. *Tosco Corp. v. Hodel*, 804 F.2d 590 (10th

Cir. 1986). As no exception to the general rule that a case is moot when the plaintiffs' claims are resolved applies, the alleged injuries of nonparties cannot save this case from mootness.

### e. Threat of Involuntary Discharge or Criminal Prosecution

The plaintiffs argue that they still suffer from threats of involuntary discharge and criminal prosecution for violating the rescinded mandate. Dkt. 77 at 13-14. The threat they refer to, however, specifically targets "those who did not file some form of accommodation." Dkt. 77 at 14 n.9. All named plaintiffs filed religious-accommodation [*18] requests, so this threat does not apply. To the extent the plaintiffs are claiming that this harms the nonparty individuals, it is irrelevant.

### f. Future Adverse Actions

In addition to present adverse actions, the plaintiffs point to the possibility of future adverse actions as evidence that this case is not moot: the possibilities of being passed over for promotions[9] and being assigned, deployed, or trained differently because of their vaccination status.[10] Dkts. 77 at 8-10, 16; 77-1 ¶ 7.

But *HN9*[↑] the possibility either of no promotion or other future adverse actions is speculative and hypothetical—and so not the type of actual, imminent, concrete, and particularized harm that Article III requires. *Lujan*, 504 U.S. at 560. These possible injuries are insufficient to sustain this case in the face of the mandate recissions.

### 3. RFRA Damage Claims

The plaintiffs broadly argue that their complaint includes

---

[6] The plaintiffs' briefing says that all the named plaintiffs had CG-3307s. Dkt. 77 at 12. In contrast, the affidavit they attached as proof refers only to Wadsworth and Wilder. Dkt. 77-1 ¶¶ 4-8.

[7] The Coast Guard defines CG-3307s as administrative remark entries that allow it to add comments to a service member's record. Dkt. 78 at 2.

[8] The court communicated with the parties via email.

---

[9] The plaintiffs claim that Wadsworth was not promoted last year because he was not vaccinated. Dkt. 77-1 ¶ 7. They do not ask the court to require retroactive promotion but instead argue that he risks being passed over for promotion this year. Dkts. 77 at 16; 77-1 ¶ 7.

[10] The plaintiffs claim that the defendants "retain a de facto mandate." Dkt. 77 at 8-10. They argue that the Coast Guard may still take unvaccinated status into account, and the plaintiffs may suffer adverse actions as a result. Dkt. 77 at 8-10.

a claim for RFRA damages that cannot be moot. Dkt. 77 at 7-8. But declaratory and injunctive relief are the only types of relief requested in connection with their RFRA claim.[11] Dkt. 1 ¶ 129 ("Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' [*19] violation of their right under RFRA to the free exercise of religion."). Thus, the RFRA claim is moot.

## B. Mootness Exceptions

The plaintiffs argue that this case is not moot because it falls under either the voluntary-cessation exception or the capable-of-repetition-yet-evading-review exception.

## 1. Voluntary Cessation

*HN10*[⬆] The voluntary-cessation exception to mootness requires courts to examine defendant-induced mootness with caution. *See Yarls*, 905 F.3d at 910. Generally, voluntary conduct does not moot a case unless the defendant demonstrates that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023) (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd on other grounds sub nom. Sossamon v. Texas*, 563 U.S. 277, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011)); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022). When considering whether voluntary conduct moots a case, courts strive to determine whether the defendant's actions are simply litigation posturing or actually extinguish the controversy. *Yarls*, 905 F.3d at 910.

But when a governmental entity, rather than another kind of defendant, voluntarily ceases possibly wrongful conduct, courts extend the defendant some solicitude. *Id.* (citing *Sossamon*, 560 F.3d at 325). "So, [w]ithout evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing.'" [*20] *Yarls*, 905 F.3d at 910 (first alteration in original) (quoting *Sossamon*, 560 F.3d at 325). "Among other things, the government's ability to reimplement the statute or regulation at issue is

insufficient to prove the voluntary-cessation exception." *Freedom from Religion Found., Inc.*, 58 F.4th at 833.

Here, both the Department of Defense and the Coast Guard have formally rescinded the vaccine mandates. The court holds that the recissions eliminate the controversy and are not simply litigation posturing. There is no evidence to the contrary and the voluntary-cessation mootness exception does not apply.

## 2. Capable of Repetition Yet Evading Review

*HN11*[⬆] To fit within the capable-of-repetition-yet-evading-review exception to mootness, "a plaintiff must show '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014) (quoting *Wilson v. Birnberg*, 667 F.3d 591, 596 (5th Cir. 2012)). This exception only applies in "exceptional" situations like "strikes, pregnancies, or elections," *Meadows v. Odom*, 198 F. App'x 348, 351-52 (5th Cir. 2006) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998)), when termination of the causal event or condition may "preclude challenge to state policies that have had their impact and that continue in force, unabated and unreviewed," *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S. Ct. 1694, 40 L. Ed. 2d 1 (1974).

First, [*21] this case does not meet the exception's duration requirement. *HN12*[⬆] In the typical case where the capable-of-repetition-yet-evading-review exception applies, the "challenged action" is short enough to evade review because the causal or underlying event or condition—not the challenged regulation or law—is too short to be fully litigated. *Meadows*, 198 F. App'x at 352 (citing *Super Tire Eng'g Co.*, 416 U.S. at 115, 125-126, and *Roe v. Wade*, 410 U.S. 113, 166, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)). For example, pregnancies, elections, and nonresident status are by nature short-duration conditions or events. *Meadows*, 198 F. App'x at 352; *see also Sosna v. Iowa*, 419 U.S. 393, 400-02, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975). The laws that regulate them are not. Here, the causal condition—the plaintiffs' religious objection—is not a condition or event that was short in duration or has terminated.

---

[11] The complaint mentions "damages" only in the introduction and in connection with the claim for APA violations. Dkt. 1 ¶¶ 8, 183.

2023 U.S. Dist. LEXIS 101876, *21

Second, there is no reasonable expectation that the plaintiffs would be subjected to the vaccine mandates again—they have been rescinded, unlike in the typical case where this exception applies. *See, e.g., Super Tire Eng'g Co.*, 416 U.S. at 125-26. *HN13*[⬆] And courts "are not in the business of pronouncing that past actions with have no demonstrable continuing effect were right or wrong." *Spencer*, 523 U.S. at 18.

The capable-of-repetition-yet-evading-review exception does not apply.

\* \* \*

The case is moot and no exceptions apply. Accordingly, the court dismisses the case without prejudice for lack of jurisdiction.

Signed **[*22]** on Galveston Island this 12th day of June, 2023.

/s/ Jeffrey Vincent Brown

JEFFREY VINCENT BROWN

UNITED STATES DISTRICT JUDGE

---

End of Document

App.042

No *Shepard's* Signal™
As of: February 12, 2024 3:54 PM Z

# Hamann v. Smith

United States District Court for the Northern District of Texas, Fort Worth Division

August 7, 2023, Decided; August 7, 2023, Filed

Civil Action No. 4:23-CV-098-P

**Reporter**
2023 U.S. Dist. LEXIS 136618 *; 2023 WL 5939368

CRYSTAL JEAN HAMANN, Petitioner, v. MICHAEL SMITH, Warden, FMC-Carswell, Respondent.

## Core Terms

time credit, moot, BOP, programming, credits, lack of jurisdiction, habeas corpus, writ petition, requests, sentence calculation, immediate release, release date, new rule, methamphetamine, projected, sentence, reentry, grams

**Counsel:** [*1] Crystal Jean Hamann, Petitioner, Pro se, Fort Worth, TX.

For Warden Mr. Smith, Respondent: Ann Cruce-Haag, LEAD ATTORNEY, US Attorney's Office, Lubbock, TX.

**Judges:** Mark T. Pittman, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Mark T. Pittman

## Opinion

### OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 filed by petitioner, Crystal Jean Hamann ("Hamann"), a federal prisoner then confined at FMC-Carswell, against Michael Smith, warden of FMC-Carswell, Respondent. After considering the pleadings and relief sought by petitioner Hamann, the Court concludes that the § 2241 petition must be **DISMISSED**.

### I. BACKGROUND

Petitioner Hamann continues to serve her 121 month term of imprisonment on her 2016 conviction in the

United States District Court for the Western District of Texas for conspiracy to possess with intent to distribute 50 grams or more of actual methamphetamine and/or 500 grams of a mixture and substance containing methamphetamine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Judgment, *United States v. Hamann*, Criminal Action No. 7:16-CR-035-RAJ-1, ECF No. 98.[1]

Although Hamann was housed at FMC-Carswell when she filed this suit, she has since been transferred to a residential reentry center on April 19, 2023. Pet. [*2] 1, ECF No. 1; App. 2, ECF No. 8. Her projected release date is October 29, 2023, via First Step Act (FSA) release with the application of 365 days of FSA time credits. App. 7-9, ECF No. 8; www.bop.gov last visited August 3, 2023.

### II. GROUND FOR RELIEF

Hamann seeks relief under § 2241 alleging that the Bureau of Prisons (BOP) has failed to apply 365 days of FSA Time Credits for her participation in classes and programs during her time in BOP custody to her sentence calculation. Pet. 7, ECF No. 1. She requests the Court order her immediate release based on the programs she has completed over the years, and order the BOP to immediately apply 365 days of FSA time credits. Pet, 8, ECF No. 1.

### III. ANALYSIS

#### A. The First Step Act's Provisions Regarding Time Credits

The FSA, Public Law No. 115-391, *enacted into law on*

---

[1] The Court takes judicial notice of the records of the United States District Court for the Western District of Texas. See Fed R. Evid. 201(a)(2) and (c)(1),

2023 U.S. Dist. LEXIS 136618, *2

*December 21, 2018*, addresses reentry of the incarcerated, directing the BOP to take specific actions regarding programming, good-time credit, and compassionate release, among other issues. Congress created a system of earned time credits and other incentives to encourage eligible inmates to participate in programming. 18 U.S.C. § 3632(d). On January 13, 2022, the Department of Justice announced the new rule on FSA credits. The [*3] January 19, 2022, edition of the Federal Register included the final rule on FSA time credits. This rule took into consideration several comments received during the notice and comment period with respect to the earning, loss of, and application of FSA time credits. And, the new rule affected Hamann's sentence calculation.

**B. Petitioner's Claim Is Now Moot**

As noted, Hamann requests in this action that the Court order the BOP to assign all time credits so she will receive 365 days off her sentence. But Hamann has now received 365 days off her sentence and the credits are being applied, making her projected release date, as noted above, October 29, 2023. Response 5-6, ECF No. 7; App. 1-2, ECF No. 8.

Under Article III of the Constitution federal courts may adjudicate only "actual, ongoing controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S. Ct. 523, 98 L. Ed. 2d 529 (1988) (citations omitted. An actual controversy must exist at all stages of review, not just when the case is filed. *See Alvarez v. Smith*, 558 U.S. 87, 92, 130 S. Ct. 576, 175 L. Ed. 2d 447 (2009). If a dispute has been resolved or if it has "evanesced because of changed circumstances, including passage of time, it is considered moot." *AMA v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988) (citation omitted). A case is moot when the court can no longer grant any effectual relief. *See Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008). If a case is moot, the court lacks subject matter [*4] jurisdiction. *Carr v. Saucier*, 582 F.2d 14, 15-16 (5th Cir. 1978).

Hamann has received the 365 days of FSA credits toward release which is the same relief she requested in the petition. The Court cannot grant her any further relief. Therefore, her claim is moot and must be dismissed. To the extent Hamann is requesting immediate release, there is no legal basis for such request. The Respondent informs that the FSA limits the maximum amount of time credits applied toward

supervised release to 12 months of credits. Resp. 6, ECFf No. 7. She has already received that credit.

Therefore, as the petition under § 2241 is moot, it must be dismissed for lack of jurisdiction.

**IV. ORDER**

For the reasons discussed herein, Crystal Jean Hamann's petition for a writ of habeas corpus under 28 U.S.C. § 2241 is **DISMISSED** for lack of jurisdiction.

**SO ORDERED** on this **7th day** of **August, 2023**.

/s/ Mark T. Pittman

Mark T. Pittman

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT**

In accordance with the order issued this same day and Federal Rule of Civil Procedure 58, it is **ORDERED, ADJUDGED,** and **DECREED** that Crystal Jean Hamann's petition for a writ of habeas corpus under 28 U.S.C. § 2241 is **DISMISSED** for lack of jurisdiction.

**SIGNED** on this **7th day** of **August, 2023**.

/s/ Mark T. Pittman

Mark T. Pittman

UNITED STATES DISTRICT JUDGE

---

End of Document

App.044

**i** Cited
As of: February 12, 2024 3:56 PM Z

# Jackson v. Mayorkas

United States District Court for the Northern District of Texas, Fort Worth Division

August 17, 2023, Decided; August 17, 2023, Filed

No. 4:22-cv-0825-P

**Reporter**
2023 U.S. Dist. LEXIS 144078 *; 2023 WL 5311482

ERIC JACKSON, ET AL., Plaintiffs, v. ALEJANDRO N. MAYORKAS, ET AL., Defendants.

## Core Terms

moot, vaccination, rescinded, Plaintiffs', missed, promotion, adverse action, declaratory relief, training, injunctive relief, reputation, rescission, posturing, military, Forces

**Counsel:** [*1] For Eric Jackson, Plaintiff: Charles W Fillmore, LEAD ATTORNEY, The Fillmore Law Firm, Fort Worth, TX; Adam Hochschild, PRO HAC VICE, Hochschild Law Firm LLC, Plainfield, VT; H Dustin Fillmore, III, The Fillmore Law Firm LLP, Fort Worth, TX; Mary Catherine Hodes, Chesterfield, MO; Michael McHale, PRO HAC VICE, Omaha, NE; Nathan Loyd, PRO HAC VICE, Thomas More Society, Chicago, IL; Paul M. Jonna, PRO HAC VICE, LiMandri & Jonna LLP, Rancho Santa Fe, CA; Stephen M Crampton, PRO HAC VICE, Thomas More Society, Tupelo, MS.

For Alaric Stone, Plaintiff: Charles W Fillmore, LEAD ATTORNEY, The Fillmore Law Firm, Fort Worth, TX; Adam Hochschild, PRO HAC VICE, Hochschild Law Firm LLC, Plainfield, VT; H Dustin Fillmore, III, The Fillmore Law Firm LLP, Fort Worth, TX; Mary Catherine Hodes, Chesterfield, MO; Michael McHale, PRO HAC VICE, Omaha, NE; Nathan Loyd, PRO HAC VICE, Thomas More Society, Chicago, IL; Paul M. Jonna, LiMandri & Jonna LLP, Rancho Santa Fe, CA; Stephen M Crampton, PRO HAC VICE, Thomas More Society, Tupelo, MS.

For Michael Marcenelle, Plaintiff: Charles W Fillmore, LEAD ATTORNEY, The Fillmore Law Firm, Fort Worth, TX; Adam Hochschild, PRO HAC VICE, Hochschild Law Firm LLC, Plainfield, [*2] VT; H Dustin Fillmore, III, The Fillmore Law Firm LLP, Fort Worth, TX; Mary Catherine Hodes, Chesterfield, MO; Michael McHale, PRO HAC VICE, Omaha, NE; Nathan Loyd, PRO HAC VICE, Thomas More Society, Chicago, IL; Paul M. Jonna,

PRO HAC VICE, LiMandri & Jonna LLP, Rancho Santa Fe, CA; Stephen M Crampton, PRO HAC VICE, Thomas More Society, Tupelo, MS.

For Alejandro N. Mayorkas, Secretary of Homeland Security, Lloyd J Austin, III, Secretary of Defense, Linda Fagan, Commandant of the Coast Guard, Brian Penoyer, Assistant Commandant for Human Resources of the Coast Guard, Defendants: Cody Taylor Knapp, LEAD ATTORNEY, United States Department of Justice, Civil Division, Washington, DC.

**Judges:** Mark T. Pittman, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Mark T. Pittman

## Opinion

### OPINION & ORDER

Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." A case is no longer a "case" or "controversy" if it becomes moot. In this case, Plaintiffs sued, contending that the Coast Guard's COVID-19 Vaccine Mandate—which forced Coast Guard members to be injected with a novel vaccine against their sincerely held religious beliefs— was unlawful. Because the Mandate was rescinded, Defendants moved to dismiss the case as moot. Every [*3] court faced with a challenge to the military's rescinded COVID-19 mandates has held that the case is moot. *See, e.g., Bazzrea v. Mayorkas,* No. 3:22-CV-265, 2023 U.S. Dist. LEXIS 101876, 2023 WL 3958912, at *7 (S.D. Tex. June 12, 2023) (Coast Guard); *Roth v. Austin,* 62 F.4th 1114, 1119 (8th Cir. 2023) (Air Force); *Colonel Fin. Mgmt. Officer v. Austin,* No. 8:21-CV-2429-SDM-TGW, 2023 U.S. Dist. LEXIS 58705, 2023 WL 2764767, at *3 (M.D. Fla. Apr. 3, 2023) (Navy and Marine Corps). This case is no different.

## BACKGROUND

### A. Coast Guard's Vaccine Mandate

In August 2021, the Secretary of Defense issued a mandate, forcing all service members of the Armed Forces under the Department of Defense's ("DOD") authority to be injected with a COVID-19 vaccine. Shortly after, the Coast Guard—under the authority of the Department of Homeland Security rather than the DOD—directed its service-members to do the same. The Coast Guard claimed to permit religious-accommodation requests. But it shockingly only granted requests by service members already slated to leave the Coast Guard.

### B. Plaintiffs and this Lawsuit

Plaintiffs Stone, Jackson, and Marcenelle are members of the Coast Guard and sought religious accommodations to be exempted from the Mandate. But their requests were denied. As a result, Plaintiffs sued, alleging that the Mandate violates the First Amendment of the United States Constitution, the Religious Freedom Restoration Act ("RFRA"), and the Administrative Procedure Act ("APA"). They seek prospective relief: (1) a declaration that the Mandate is [*4] unlawful; and (2) injunctive relief prohibiting enforcement of the Mandate or Defendants' taking adverse action against Plaintiffs related to the Mandate.

### C. Rescission of the Mandate

After Plaintiffs sued, Congress passed the National Defense Authorization Act ("NDAA"), directing the Secretary of Defense to rescind the Mandate that members of the Armed Forces must be injected with a COVID-19 vaccine. Pub. L. No. 117-263, 136 Stat. 2395, 2571-72. The Secretary complied and instructed that current service members who sought an exemption from the vaccination requirement may not be "separated solely on the basis of their refusal to receive the COVID-19 vaccination" and required the military services to "update the records of such individuals to remove any adverse actions solely associated with denials of such requests." Sec'y of Def. Mem. (Jan. 10, 2023).

A day later, the Coast Guard similarly rescinded its

Mandate. The Coast Guard also issued formal policies that prohibit new adverse actions on the basis of vaccination status, require past adverse actions associated with the Mandate to be corrected, and permit full participation in the service by unvaccinated members.

### D. Defendants' Motion to Dismiss

Because the Coast Guard rescinded [*5] its Mandate, Defendants now move to dismiss this case as moot. Plaintiffs, however, argue that the case is not moot because they continue to face ongoing and prospective harm based on their past objections to the Mandate. They claim that the Coast Guard refuses to grant Plaintiff Marcenell a promotion that he missed out on due to his vaccination status, refuses to remove administrative remarks in Plaintiffs' records referencing their vaccination statuses, and subjects Plaintiffs and other unvaccinated service members to a discriminatory quarantine policy.

## LEGAL STANDARD

Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2. The "case" or "controversy" must remain throughout a case's existence. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013). If not, a case is moot and must be dismissed for lack of subject-matter jurisdiction. *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307 (5th Cir. 2021).

## ANALYSIS

Defendants argue this case is moot because the Mandate has been repealed and no relief remains available to Plaintiffs. But Plaintiffs disagree and contend that (1) their claims are not moot because relief for their claims is still available, and (2) even if they were moot, this case falls under several mootness exceptions. The Court addresses both arguments in turn.

### A. Mootness

A case is [*6] moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing

party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012). Plaintiffs seek injunctive and declaratory relief against Defendants due to the Mandate. The Court addresses whether either form of relief would be effectual for Plaintiffs.

### 1. Injunctive Relief

Plaintiffs first seek injunctive relief prohibiting enforcement of the Mandate or Defendants from taking adverse action against them based on the Mandate. But the Mandate—requiring Plaintiffs to receive a COVID-19 Vaccine—has been rescinded. So "[t]here is no need to enjoin policies that no longer exist." *U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666, 672 (5th Cir. 2023). Plaintiffs also no longer face any "adverse actions" from the Mandate. The Coast Guard's "policies now formally prohibit any new adverse administrative actions against unvaccinated servicemembers and require removing past adverse actions." *Id.* at 673 (cleaned up). Thus, enjoining enforcement or adverse action against Plaintiffs related to the rescinded Mandate "offers Plaintiffs no effectual relief." *Id.*

### 2. Declaratory Relief

Plaintiffs also seek a declaratory judgment that the Mandate violates the First Amendment of the United States Constitution, RFRA, and the APA. A plaintiff's claim for declaratory relief may not be moot "even if injunctive **[*7]** relief is no longer available to him or her." *Manzo-Hernandez v. Saucedo*, No. 21-40034, 2021 U.S. App. LEXIS 35251, 2021 WL 5627068, at *3 (5th Cir. Nov. 30, 2021). But for that to be the case, the plaintiff must demonstrate either (1) continuing harm or (2) a real-and-immediate threat of repeated injury in the future. *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).

Plaintiffs have shown neither. Now that the Mandate "is off the books, there is nothing injuring the plaintiff and, consequently, nothing for the court to do." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). And Plaintiffs identify no threat of imminent future harm from the Mandate. Plaintiffs allege only past harm—deprivation of their constitutional right to free exercise of their religion, missed opportunities for promotion and training, and reputational damage—resulting from the Mandate. And such harm will not suffice for declaratory

relief. *See Bauer*, 341 F.3d at 358 (holding that a claim for declaratory relief is moot because the plaintiff alleged only past injuries).

Thus, "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit," Plaintiffs' claim for declaratory relief is moot. *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018); *see also Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 832 (5th Cir. 2023).

* * *

In sum, Plaintiffs' claim for injunctive relief is moot because enjoining enforcement or adverse action against Plaintiffs related to the rescinded Mandate "offers Plaintiffs no effectual **[*8]** relief." *U.S. Navy SEALs 1-26*, 72 F.4th at 673. And Plaintiffs' claim for declaratory relief is moot because they allege past harms but no continuing or immediate threat of harm resulting from the rescinded Mandate. *See Bauer*, 341 F.3d at 358. Thus, absent an exception, the case is moot. It is to those exceptions that the Court now turns.

### B. Mootness Exceptions

Plaintiffs contend that their claims fall under one of three potential exceptions to the mootness doctrine: (1) collateral consequences; (2) voluntary cessation; and (3) capable of repetition yet evading review. The Court addresses each in turn.

### 1. Collateral Consequences

As their main defense to mootness, Plaintiffs invoke the collateral-consequences doctrine. The doctrine states that, even when a plaintiff's primary injury has ceased, the case is not moot if the challenged conduct continues to cause other harm that the court can remedy. *See Sibron v. New York*, 392 U.S. 40, 53-59, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). Plaintiffs offer a list of three harms left unresolved by the rescission of the Mandate: (1) a discriminatory quarantine policy; (2) administrative remarks in their personnel files referencing their vaccination statuses; and (3) missed opportunities for promotion and training.

Start with the discriminatory quarantine policy. It requires unvaccinated **[*9]** service members—but not vaccinated services members—to quarantine if they contract COVID-19. But this policy is not a part of the

Mandate. And Plaintiffs assert no cause of action against this policy. Thus, any ruling for Plaintiffs would not remedy this harm. *See Mendoza-Flores v. Rosen*, 983 F.3d 845, 848 (5th Cir. 2020) ("Collateral consequences must stem from the underlying cause of action to salvage justiciability.").

Next, the administrative remarks in Plaintiffs' personnel files. The personnel records documenting Plaintiffs' failure to comply with the Mandate were removed. Plaintiffs contend that the documentation[1] of that removal could hurt their service reputation. But the possibility of such harm is speculative and not the type of actual, imminent, concrete, and particularized harm that Article III requires. *See Danos v. Jones*, 652 F.3d 577, 584 (5th Cir. 2011). And even if Plaintiffs' reputations were harmed by the removal documentation, an interest in vindicating reputation is not "constitutionally sufficient to avoid mootness." *Spencer v. Kemna*, 523 U.S. 1, 16 n.8, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998); *see also Danos*, 652 F.3d at 584 ("[W]here reputational injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is possible and the injury cannot satisfy the requirements of Article III.").

Finally, the missed opportunities for promotion and training. Plaintiff **[*10]** Marcenelle alleges that he missed a promotion opportunity with the Special Selection Board due to his vaccination status. But after the Mandate was rescinded, the Special Selection Board agreed to give him that opportunity and will consider him for promotion next month. And if promoted, Marcenelle will receive pay, benefits, and rank with the same effective date as if his first selection board had promoted him. *See* 14 U.S.C. § 2120(d). But even if the Coast Guard had not remedied Marcenelle's missed promotion opportunity, the Court cannot remedy such an injury. *See Orloff v. Willoughby*, 345 U.S. 83, 92, 73 S. Ct. 534, 97 L. Ed. 842 (1953) ("Whether Orloff deserves appointment is not for judges to say and it would be idle, or worse, to remand this case to the lower courts on any question concerning his claim to a commission.").[2]

Plaintiff Stone alleges that—contrary to the Coast Guard's policy at the time—he could not attend a training course because of his vaccination status. And because of the missed training, he was downgraded a point on his officer evaluation. But Stone seeks prospective relief rather than compensatory relief to redress that harm. And missing a training session under past policy provides no basis for prospective relief. *See Log Cabin Republicans v. United States*, 658 F.3d 1162, 1167 (9th Cir. 2011) (collateral-consequences doctrine **[*11]** did not apply in a constitutional challenge to a policy because "missed benefits are not legal penalties from past conduct").[3]

In any event, with Marcenelle's missed promotion opportunity and Stone's missed training, "this Court has no authority to interfere in such 'professional military judgments' and promotional decisions made within the military branch." *Crocker v. Austin*, No. CV 22-0757, 2023 U.S. Dist. LEXIS 108509, 2023 WL 4143224, at *8 (W.D. La. June 22, 2023) (quoting *Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301, 1302, 212 L. Ed. 2d 348 (2022)).

Thus, the collateral-consequences exception does not apply here.

## 2. Voluntary Cessation

Plaintiffs next look to the voluntary-cessation doctrine as another possible lifeline to avoid mootness. The doctrine prevents a defendant from mooting a case simply by ending its unlawful conduct once sued. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982). It applies if the defendant can demonstrate that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Freedom from Religion Found.*, 58 F.4th at 833. "Essentially, the goal is to determine whether the defendant's actions are

---

[1] Such documentation simply ensures that there is an accurate record of the changes to Plaintiffs' files and is in accordance with how the military corrects its records. *See* ECF No. 75 at ¶ 4.

[2] To remedy any monetary loss Plaintiffs suffered as a result of the Mandate, such relief must be sought in the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1)

[3] Assuming Stone's injury has not been remedied, the proper avenue to redress his injury starts with the military's administrative process. *See Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974) ("[A] court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (B) exhaustion of available intraservice corrective measures.").

'litigation posturing' or whether the controversy is actually extinguished." *Yarls*, 905 F.3d at 910.

But "when a governmental entity, rather than another kind of defendant, voluntarily ceases possibly wrongful conduct, courts extend the defendant some solicitude." *Bazzrea*, 2023 U.S. Dist. LEXIS 101876, 2023 WL 3958912, at *6 (citing *Yarls*, 905 F.3d at 910). "So, 'without evidence to the contrary, courts [*12] assume that formally announced changes to official governmental policy are not mere litigation posturing.'" *Yarls*, 905 F.3d at 910 (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009)) (cleaned up). "Among other things, the government's ability to reimplement the statute or regulation at issue is insufficient to prove the voluntary-cessation exception." *Freedom from Religion Found., Inc.*, 58 F.4th at 833.

Plaintiffs contend that the exception must apply because the NDAA does not apply to the Coast Guard. The NDAA directs the Secretary of Defense to rescind the Mandate so that members of the Armed Forces be vaccinated against COVID-19. NDAA, Pub. L. No. 117-263, 136 Stat. 2395, 2571-72. While the Coast Guard is not under the authority of the Secretary of Defense, when Congress refers to "armed forces," that term generally "means the Army, Navy, Air Force, Marine Corps, Space Force, and *Coast Guard*." 10 U.S.C. § 101(a)(4) (emphasis added). Thus, it is unclear whether the NDAA directs the Coast Guard to rescind its Mandate. Perhaps the lack of clarity on that front caused Plaintiffs to name the Secretary of Defense as a Defendant and treat the DOD's Mandate as interchangeable and coextensive with the Coast Guard's Mandate. *See* ECF No. 1 at ¶ 36. In any event, even if the Coast Guard rescinded its Mandate voluntarily rather than as required by congressional decree, doing [*13] so does not show that Defendants engaged in "litigation posturing."

Instead, the Court agrees with the court's holding in *Bazzrea*—the DOD and Coast Guard rescinded their Mandates, not as mere "litigation posturing," but as purposeful government action. 2023 U.S. Dist. LEXIS 101876, 2023 WL 3958912, at *7. The Court assumes that the rescission by the government was done in good faith. *See Allied Home Mortg. Corp. v. U.S. Dep't of Hous. & Urb. Dev.*, 618 F. App'x 781, 786 (5th Cir. 2015). And the possibility for the Coast Guard to reissue the Mandate is too speculative to overcome the mootness doctrine. *See Thomas v. Bryant*, 938 F.3d 134, 144 n.21 (5th Cir. 2019); *State of Ala. ex rel.*

*Baxley v. Woody*, 473 F.2d 10, 14 (5th Cir. 1973).

Thus, the voluntary-cessation exception does not apply here.

### 3. Capable of Repetition Yet Evading Review

Plaintiffs look to the capable-of-petition-yet-evading-review exception to mootness as their last line of defense. But that exception looks the other way. It applies only when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 440, 131 S. Ct. 2507, 180 L. Ed. 2d 452 (2011) (cleaned up). Neither requirement is met.

*First*, this case does not meet the duration requirement. Plaintiffs complain that the Coast Guard took too long to deny their religious-accommodation requests—leaving insufficient [*14] time for them to sue and obtain relief. But the challenged regulation or law must be short enough to evade review because the causal or underlying event or condition is too short to be fully litigated. *Meadows v. Odom*, 198 F. App'x 348, 352 (5th Cir. 2006). For example, "cases involving strikes, pregnancies, or elections" are, by nature, short-duration conditions or events. *Id.* at 351-52. "Here, the causal condition—the plaintiffs' religious objection—is not a condition or event that was short in duration or has terminated." *Bazzrea*, 2023 U.S. Dist. LEXIS 101876, 2023 WL 3958912, at *7; *see Crocker*, 2023 U.S. Dist. LEXIS 108509, 2023 WL 4143224, at *7 And "[a] military vaccination requirement does not 'inevitably expire' and naturally constrain judicial review in the same way other regulations and laws under this exception do." *Crocker*, 2023 U.S. Dist. LEXIS 108509, 2023 WL 4143224, at *7 (quoting *ITT Rayonier Inc. v. United States*, 651 F.2d 343, 346 (5th Cir. 1981)).

*Second*, "Plaintiffs have provided no evidence that they will be subjected to another COVID-19 vaccination requirement, and thus, they cannot show a 'demonstrated probability,' as opposed to a 'theoretical possibility,' that they will be subject to this same government action in the future." *Crocker*, 2023 U.S. Dist. LEXIS 108509, 2023 WL 4143224, at *7 (quoting *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010)). And courts "are not in the business of pronouncing that past actions which have no

demonstrable continuing effect were right or wrong." *Spencer*, 523 U.S. at 18.

This exception thus does not apply.

\* \* \*

In sum, none of the three mootness exceptions raised by [\*15] Plaintiffs apply. The collateral-consequences exception does not apply because the Court cannot remedy the list of Plaintiffs' grievances left unresolved by the rescission of the Mandate. The voluntary-cessation exception does not apply because Defendants' rescission of the Mandate was not litigation posturing. And the capable-of-petition-yet-evading-review exception does not apply because the challenged action is not too short in duration to be fully litigated and there is no reasonable expectation that Plaintiffs would face the Mandate again.

## CONCLUSION

Because Plaintiffs' claims for injunctive and declaratory relief are moot and no mootness exception applies, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 69) and **DISMISSES** Plaintiffs' claims **without prejudice**.[4]

**SO ORDERED** on this **17th day of August 2023**.

/s/ Mark T. Pittman

Mark T. Pittman

UNITED STATES DISTRICT JUDGE

## FINAL JUDGMENT

This Final Judgment is issued pursuant to Federal Rule of Civil Procedure 58. In accordance with the Court's Order of Dismissal (ECF No. 98) entered on August 17, 2023:

It is **ORDERED, ADJUGED, and DECREED** that this civil action is **DISMISSED without prejudice**.

The Clerk is **DIRECTED** to transmit a true copy of this

Final Judgment to the [\*16] Parties.

**SO ORDERED** on this **17th day of August 2023**.

/s/ Mark T. Pittman

Mark T. Pittman

UNITED STATES DISTRICT JUDGE

---

End of Document

---

[4] Plaintiffs seek leave to amend their complaint. But now that this case is moot, it is too late for Plaintiffs to amend. *See Whitmire v. Victus Ltd.*, 212 F.3d 885, 888 (5th Cir. 2000).