IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>ARJUNA CAPITAL, LLC, and FOLLOW THIS,<br><br>*Defendants.* | Civil Action No.: 4:24-CV-00069-P |

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND BUSINESS ROUNDTABLE AS AMICI CURIAE SUPPORTING PLAINTIFF EXXON MOBIL CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

Interest of Amici Curiae ..................................................................................................1
Introduction.....................................................................................................................2
Background......................................................................................................................4
Argument..........................................................................................................................8
    I.   Special interest groups have used SEC Rule 14a-8 to hijack the proxy-vote process and advance their preferred social policies. ................................... 8
        A.  Activist groups inundate public corporations with proposals designed to push ideological agendas. ............................................................. 8
        B.  The SEC cedes corporate proxy statements to takeover by special interest activists. ......................................................................................10
    II.  ExxonMobil should be allowed to exclude Defendants' shareholder proposal from its proxy statement. ......................................................................11
Conclusion .....................................................................................................................12
Certificate of Service ....................................................................................................13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores Inc.*,
  821 F. Supp. 877 (S.D.N.Y. 1993) ...................................................................................5

*Apache Corp. v. Chevedden*,
  696 F. Supp. 2d 723 (S.D. Tex. 2010) ..............................................................................7

*In re Franchise Servs. of N. Am., Inc.*,
  891 F.3d 198 (5th Cir. 2018) ............................................................................................4

*Kanen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991) ............................................................................................................4

*Paramount Commc'ns, Inc. v. Time Inc.*,
  571 A.2d 1140 (Del. 1989) ...............................................................................................4

*Roosevelt v. E.I. Du Pont de Nemours & Co.*,
  958 F.2d 416 (D.C. Cir. 1992) ..........................................................................................7

*Spiegel v. Buntrock*,
  571 A.2d 767 (Del. 1990) .................................................................................................4

*Stroud v. Grace*,
  606 A.2d 75 (Del. 1992) ...................................................................................................5

*Trinity Wall St. v. Wal-Mart Stores, Inc.*,
  792 F.3d 323 (3d Cir. 2015) ..........................................................................................5, 6

**Statutes**

15 U.S.C. § 78n ........................................................................................................................6

8 Del. Code § 142 ....................................................................................................................4

8 Del. Code § 211 ....................................................................................................................4

8 Del. Code § 212 ....................................................................................................................5

8 Del. Code § 216 ....................................................................................................................5

8 Del. Code § 242 .................................................................................................................... 4

Nev. Rev. Stat. § 78.320 .......................................................................................................... 5

Nev. Rev. Stat. § 78.330 .......................................................................................................... 4

Securities Exchange Act of 1934, Pub. L. 73-291 § 14, 48 Stat. 881 (1934) ........................... 6

**Other Authorities**

17 C.F.R. § 240.14a-8 ..................................................................................................... *passim*

13 Fed. Reg. 3973 (July 14, 1948) .......................................................................................... 2

62 Fed. Reg. 50682 (Sept. 26, 1997) ....................................................................................... 2

63 Fed. Reg. 29106 (May 28, 1998) ........................................................................................ 6

85 Fed. Reg. 70240 (Nov. 4, 2020) ......................................................................................... 9

5 Fletcher Cyc. Corp. § 1996.20 (2023) .................................................................................. 4

As You Sow, Proxy Preview 2023 (Feb. 15, 2023) ................................................................. 9

Henry N. Butler & Larry E. Ribstein, *Corporate Governance Speech and the First Amendment*, 43 U. Kan. L. Rev. 163, 189 (1994) ....................................................... 7

Comment Letter from the U.S. Chamber of Commerce to the SEC, at 6 (Sept. 12, 2022) ................................................................................................................. 10

Division of Corporate Finance, SEC Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021) ............................................................................................................ 3, 7, 10

Thomas Lee Hazen, 2 Law Sec. Reg. § 10:6 .......................................................................... 5

Letter from Tom Quaadman, Executive Vice President, U.S. Chamber Center for Capital Markets Competitiveness, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission (Jan. 31, 2020) ................................................................................................................... 1

Tom C.W. Lin, *CEOs and Presidents*, 47 U.C. Davis L. Rev. 1351 (2014) ............................ 4

Model Bus. Corp. Act § 8.40 ................................................................................................... 4

Ronald O. Mueller, et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harvard Law School Forum on Corporate Governance (Aug. 3, 2023) ................................................................................................................. 9

**INTEREST OF AMICI CURIAE**

Amicus the Chamber of Commerce of the United States of America is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. One way the Chamber promotes the interests of its members and the broader business community is by participating in cases with important implications for its members—including cases regarding the proxy voting system used to facilitate thousands of shareholder meetings held by publicly traded corporations each year. This case concerns the SEC's rules regarding proxy statements and the ordinary-business and resubmission exceptions to those rules—a subject on which the U.S. Chamber's Center for Capital Markets Competitiveness has engaged frequently with the SEC.[1]

Amicus Business Roundtable represents the chief executive officers ("CEOs") of over 200 of America's leading companies. The CEO members lead U.S.-based companies that support one in four American jobs and almost a quarter of U.S. gross domestic product. Business Roundtable was founded on the belief that businesses should play an active and effective role in the formulation of public policy, and Business Roundtable members de-

---

[1] *See, e.g.*, Letter from Tom Quaadman, Executive Vice President, U.S. Chamber Center for Capital Markets Competitiveness, to Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission (Jan. 31, 2020), *available at* https://www.sec.gov/comments/s7-23-19/s72319-6730870-207447.pdf.

1

velop and advocate for policies to promote a thriving U.S. economy and expanded opportunity for all. Business Roundtable participates in litigation as amicus curiae when important business interests are at stake.

## INTRODUCTION

Each year, public corporations are inundated with proposals from a limited set of special interest activist shareholders pushing social and political agendas that are divorced from shareholder value—and often designed in a way that would undermine the corporation's success. The SEC's Rule 14a-8 has allowed "any shareholder owning a relatively small amount of the company's shares to have his or her own proposal placed alongside management's proposals in the company's proxy materials." Amendments to Rules on Shareholder Proposals, 62 Fed. Reg. 50682, 50682 (Sept. 26, 1997). Effective communication between public companies and investors is a bedrock principle of our capital markets; however, shareholder proposals also impose costs on corporations and shareholders alike. In order to balance these considerations, the SEC has, since Rule 14a-8's introduction, placed restrictions on shareholder access to proxy statements. Notice of Proposal to Amend Proxy Rules, 13 Fed. Reg. 3973 (July 14, 1948). Rule 14a-8 provides, for instance, that a company may "exclude [a shareholder] proposal . . . [i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). Proper application of these exceptions is critical to preserving the balance between giving shareholders a voice in corporate decisionmaking and protecting all shareholders' interest in the company's efficient operation.

2

The SEC's current interpretation of Rule 14a-8's "ordinary business operations" exception, however, upsets that balance to the detriment of public corporations and shareholders alike. The SEC has determined that corporations may not rely on the ordinary-business-operations exception to exclude any "proposal rais[ing] issues with a broad societal impact." Division of Corporate Finance, SEC Staff Legal Bulletin No. 14L (CF) (Nov. 3, 2021) ("SLB-14L").[2] Companies must include such proposals in their proxy statements even if there is no "nexus between a policy issue and the company." *Id.* By opening the door to shareholder proposals pushing social and political agendas, the SEC has allowed a subset of activists to commandeer corporate proxy statements for their own parochial ends. Other shareholders must process, analyze, and vote on often frivolous proposals, diverting time and energy from proper consideration of genuine proposals. And companies must spend tens of millions of dollars to print these proposals, distribute proxy materials, and tabulate votes. The result? Obstruction of the very communication that Rule 14a-8 is intended to facilitate.

This is a case in point. Defendants Arjuna Capital, LLC, and Follow This submitted a shareholder proposal to Exxon Mobil Corporation ("ExxonMobil") designed to pursue social and political objectives at the direct expense of ExxonMobil's core energy business. ExxonMobil had every right to exclude that proposal from its own proxy statement, and it has every reason to expect that it will face materially similar proposals in the future. The Court should take this opportunity to confront this abuse of the proxy-solicitation process at the expense of corporations and main-street investors by applying the SEC's Rule 14a-8 ordinary-business exception as written.

---

[2] https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

3

## BACKGROUND

Black letter corporate law provides that directors, rather than shareholders, manage the business and affairs of the corporation. *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150 (Del. 1989); *see In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 210 (5th Cir. 2018) ("the management prerogative rests with the board"). "The exercise of this managerial power is tempered by fundamental fiduciary obligations owed by the directors to the corporation and its shareholders." *Spiegel v. Buntrock*, 571 A.2d 767, 772–73 (Del. 1990); *see Kanen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991). A corporation's directors, in turn, select officers to manage the affairs of the corporation. *E.g.*, 8 Del. Code § 142(b); Model Bus. Corp. Act § 8.40.

The separation of management from ownership means, among other things, that "corporations are governed less as direct democracies, and more as democratic republics. Shareholders elect board members to govern the corporation just as citizens elect representatives to govern the nation." Tom C.W. Lin, *CEOs and Presidents*, 47 U.C. Davis L. Rev. 1351, 1399-400 (2014) (footnote omitted). State law typically requires the corporation to hold an annual meeting for shareholders to elect directors. *E.g.*, 8 Del. Code § 211(b); *id.* § 216(3); Nev. Rev. Stat. § 78.330(1); *see* 5 Fletcher Cyc. Corp. § 1996.20 (2023). State law may also require a shareholder vote for other specific matters of corporate governance, such as fundamental corporate changes like charter amendments, 8 Del. Code § 242, mergers, *id.* § 251, sale of assets, *id.* § 271, and dissolution, *id.* § 275. Corporations may also voluntarily choose to take shareholder votes on other matters. *E.g.*, 8 Del. Code § 211; *see* 5 Fletcher Cyc. Corp. § 1996.30.

Most shareholders, however, do not attend shareholder meetings in person. *See Stroud v. Grace*, 606 A.2d 75, 86 (Del. 1992). The proxy mechanism can therefore be critical to corporate governance when state law or company bylaws require a certain number of shares to be represented at a meeting for the corporation to conduct business. *See* 8 Del. Code § 216 (quorum requires majority of shares entitled to vote); Nev. Rev. St. § 78.320(1)(a) ("[a] majority of the voting power . . . present in person or by proxy"). If a majority of shareholders do not attend annual meetings, the absence of the proxy mechanism could leave corporations "unable to elect directors and take other required actions." *Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores Inc.*, 821 F. Supp. 877, 881 (S.D.N.Y. 1993).

State corporate laws therefore allow shareholders who do not attend in person to grant the corporation (or sometimes other shareholders) a proxy to vote on their behalf at the meeting. *See Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015); 8 Del. Code § 212(b). "A proxy is a means by which a shareholder authorizes another person to represent her and vote her shares at a shareholders' meeting in accordance with the shareholder's instructions on the proxy card." *Amalgamated Clothing*, 821 F. Supp. at 881; *see* Thomas Lee Hazen, 2 Law Sec. Reg. § 10:6 ("The proxy itself is any shareholder consent or authorization regarding the casting of that shareholder's vote.").

The corporation's proxy statement contains multiple features. It solicits authority for the corporation to vote by proxy the shares of the absent shareholder. *Trinity Wall St.*, 792 F.3d at 334. It also "includes information about items or initiatives on which the shareholders are asked to vote" by the corporation through management. *Id.* at 328.

5

As part of the Securities Exchange Act of 1934, Congress granted the SEC certain authority to regulate corporations' proxy solicitations. Section 14 of the Act, now codified at 15 U.S.C. § 78n, permits the SEC to regulate "proxy" solicitations "as necessary or appropriate in the public interest or for the protection of investors." Securities Exchange Act of 1934, Pub. L. 73-291 § 14, 48 Stat. 881, 895 (1934) (codified as amended at 15 U.S.C. § 78n(a)(1)).

The SEC's Rule 14a-8 goes beyond Congress's goal of providing accurate information to shareholders. It mandates that public corporations include in their proxy solicitations certain proposals submitted by qualifying shareholders. Promulgated in its current form in 1998, the rule enumerates the many circumstances in which "a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders." 17 C.F.R. § 240.14a-8; *see* 63 Fed. Reg. 29106, 29119 (May 28, 1998).

Rule 14a-8 contains exceptions, one of which allows a company "to exclude [a shareholder] proposal . . . [i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). If a company wants to exclude a shareholder proposal, it must file a statement with SEC staff providing reasons why it believes the proposal may be excluded. *Id.* § 240.14a-8(j)(1). SEC approval is not required to exclude a shareholder proposal; however, companies typically include a request for a so-called "no-action" letter, which states that exclusion of the proposal will not result in enforcement action. *See, e.g.*, *Trinity Wall St.*, 792 F.3d at 336-37. A no-action letter will issue if the company persuades the SEC that a proposal may be excluded from the com-

6

pany's proxy solicitation. 17 C.F.R. § 240.14a-8(g). Although no-action relief is not a prerequisite to exclusion, denial of no-action relief typically results in the inclusion of a shareholder proposal on the corporate proxy statement.

The scope of the ordinary-business-operations exception has varied over the years, but the SEC recently narrowed it significantly to provide that any "proposal rais[ing] issues with a broad societal impact" does not qualify for the exception—even if there is no "nexus between a policy issue and the company."[3] In practice, this permits shareholders with as little as $2,000 worth of shares to commandeer the company's proxy statement by forcing a shareholder vote on any issue, however irrelevant or harmful to the company's business interests. 17 C.F.R. § 240.14a-8(b)(1)(i)(A). These shareholder proposals frequently seek to force the corporation to take a position on controversial social and political issues. *See, e.g.*, Henry N. Butler & Larry E. Ribstein, *Corporate Governance Speech and the First Amendment*, 43 U. Kan. L. Rev. 163, 189 (1994) ("[E]ven purely 'internal' speech relating to corporate governance has important political ramifications, including the issue of what political positions managers should take."). As currently interpreted by the SEC, Rule 14a-8 grants broad "[a]ccess to management proxy solicitations," *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992), enabling activist shareholders to "force management to include [their] proposal in management's proxy statement, along with a statement supporting the proposal, at the company's expense," *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 728 (S.D. Tex. 2010).

---

[3] SLB-14L, https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

7

## ARGUMENT

## I. Special interest groups have used SEC Rule 14a-8 to hijack the proxy-vote process and advance their preferred social policies.

A surge of activist shareholders have abused Rule 14a-8 to force onto corporate proxy statements a host of proposals addressing social and political issues. Many of these proposals have little or no relevance to the target company's business. Some—like the proposal at issue here—threaten the target company's well-being. The activist-proposal process involves two critical steps. First, an advocacy group formulates a social policy proposal and submits it on behalf of a small shareholder for inclusion in a corporation's proxy statement. Second, the SEC relies on its broad interpretation of Rule 14a-8's mandate to force companies to include activist proposals in corporate proxy statements.

### A. Activist groups inundate public corporations with proposals designed to push ideological agendas.

The process begins with groups like Arjuna Capital, whose stated mission emphasizes "shareholder activism" to "press companies to better manage their Environmental, Social, and Governance (ESG) risks."[4] Whether or not these goals are laudable, they should not be addressed through corporate proxy statements. These activist shareholders usually hold a *de minimis* stake in the corporation, often having acquired shares for the primary purpose of advancing their social or political goals, not for economic reasons. Unable to achieve success for their agendas in the political arena, these groups attempt

---

[4] https://arjuna-capital.com/; *see also* follow-this.org/our-story (announcing its mission to "put climate action on the ballot," and force "Big Oil" to "put their brains and billions in clean energy").

instead to exploit Rule 14a-8. On behalf of a qualifying shareholder, the advocacy group submits a proposal seeking to force the company to include and address the proposal in its proxy statement. And advocacy groups commonly submit substantially the same proposals year after year.

Although activist proposals come from all points on the political spectrum, they tend to focus on environmental, social, and governance ("ESG") matters. In 2023, "social and environmental proposals combined represented over 50% of all proposals submitted."[5] In February 2023, As You Sow boasted that activists had already "filed at least 542 shareholder resolutions on environmental, social and related sustainable governance issues for the 2023 proxy season, about the same as last year and on track to match or exceed last year's unprecedented final total of 627."[6] And "[t]he current political climate means companies can expect more proposals next year."[7]

Though largely unsuccessful, these proposals impose real costs on companies and, ultimately, shareholders. The SEC has estimated that shareholder proposals can impose up to $150,000 in direct costs on a company *per proposal*. *See* 85 Fed. Reg. 70240, 70274 (Nov. 4, 2020). Thus, the process wastes tens of millions of dollars that could otherwise be used to create value for investors. *See id.* at 70245 & n.63 (collecting comment letters

---

[5] Ronald O. Mueller, et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harvard Law School Forum on Corporate Governance (Aug. 3, 2023), https://perma.cc/8M97-GHUH ("The number of both environmental and social proposals also increased, up 11% and 3% respectively, compared to 2022 and 68% and 24% respectively, compared to 2021.").

[6] As You Sow, Proxy Preview 2023 (Feb. 15, 2023), https://www.proxy-preview.org/2023/report.

[7] Richard Vanderford, *Shareholder Activists Drag Companies Into U.S. Culture Wars*, Wall St. J. (May 23, 2023), https://perma.cc/DK5J-TMY2.

reflecting costs of each proposal ranging from $20,000 to $150,000 and citing the Chamber's Comments, which affirmed the SEC's range of $87,000-$150,000 as "a fair estimate for a typical proposal").

### B. The SEC cedes corporate proxy statements to takeover by special interest activists.

The SEC has assumed a central role in activists' effort to inject the Nation's most intractable social and political debates into the agendas of public corporations. To keep activist proposals off of their proxy statements, corporations often argue that the proposals may be excluded under Rule 14a-8(i)(7)'s ordinary-business-operations exception. Corporations sometimes seek to persuade the SEC of their position and obtain a no-action letter—effectively a statement that exclusion of the proposal will not result in an enforcement action by the SEC.

The SEC has shirked its responsibility, taking the categorical position that "issues with a broad societal impact" do not qualify for that exception, regardless of whether there is any "nexus" between the issue and the company's actual business.[8] Predictably, this new position has drastically reduced the success rate of no-action requests, with only 38% of requests succeeding in 2022—down from 71% the year before.[9] And the SEC's stance has only encouraged a new surge of ideologically driven proposals, forcing companies to devote even more time and money to controversial social and political topics that have nothing to do with creating value for shareholders.[10]

---

[8] SLB-14L, https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

[9] Comment Letter from the U.S. Chamber of Commerce to the SEC, at 6 (Sept. 12, 2022), https://www.sec.gov/comments/s7-20-22/s72022-20138937-308638.pdf.

[10] *See* Vanderford, *supra*.

10

## II. ExxonMobil should be allowed to exclude Defendants' shareholder proposal from its proxy statement.

This case exemplifies activist groups' takeover of the shareholder proposal process to score ideological points at the expense of the target corporation's business. Arjuna Capital, LLC and Follow This submitted a joint proposal aimed at "further accelerating the pace of emission reductions in the medium-term for its greenhouse gas (GHG) emissions across Scope 1, 2, and 3, and to summarize new plans, targets, and timetables." Complaint ¶¶ 66-67. Substantially the same proposal was submitted—and conclusively rejected—in 2022 and 2023. *See id.* ¶¶ 102-04. ExxonMobil promptly opposed this proposal under the ordinary-business-operations and resubmission exceptions, 17 C.F.R. §§ 240.14a-8(i)(7), -8(i)(12), and properly notified the SEC. Complaint ¶¶ 69-70. This reflects a straightforward application of Rule 14a-8.

As ExxonMobil has explained at length, constructing a plan to reduce greenhouse gas emissions (which ExxonMobil has done) requires comprehensive knowledge of the company's global energy business—from research and investment in new technologies, exploration, production, and product strategy to geopolitics and global energy demand. *See id.* ¶¶ 72-82. Balancing those myriad factors calls for the kind of business judgment possessed by ExxonMobil's management. Arjuna and Follow This would substitute that judgment with a shareholder vote—potentially requiring the company to start over by producing "new plans, targets, and timetables." *Id.* ¶ 66. Of course, Arjuna and Follow This do not really want ExxonMobil to produce "new plans"; their proposal is intended to eliminate *any* future plans "for further investments in exploring for more oil and gas," *see id.* ¶ 83, regardless of the consequences to ExxonMobil and its shareholders, and regardless of shareholders' rejection of materially indistinguishable proposals in the past.

11

ExxonMobil exercised its right to invoke this Court's jurisdiction to obtain a ruling against these activists' abuse of the shareholder-proposal system. Faced with a neutral federal forum, Arjuna Capital, LLC, and Follow This chose to retreat and preserve their option to file a substantially similar proposal next year.

Until the courts weigh in, activist investors will continue, with the SEC's approbation, to inundate public corporations with proposals designed to push an ideological agenda divorced from the success of the corporation—or worse, as in this case, directly antagonistic to it. ExxonMobil should not be denied the opportunity to prove its claims on the merits and end this ongoing campaign to usurp the company's business judgment and devalue shareholders' investment in the energy sector.

## CONCLUSION

The Court should deny Defendants' motion to dismiss and proceed to summary judgment on the merits of ExxonMobil's claims.

Dated: February 28, 2024

Respectfully submitted,

/s/ Scott A. Keller

Steven P. Lehotsky
(*Pro hac vice forthcoming*)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001

Scott A. Keller
(Texas Bar # 24062822)
scott@lkcfirm.com
Matthew H. Frederick
(Texas Bar # 24040931)
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
T: (512) 693-8350
F: (512) 727-4755

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2024, the foregoing was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ Scott A. Keller
Scott A. Keller
